## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TABITHA ALBERTI, | ) | Case No.: 1:24-CV-03219 (JEB) |
| *Plaintiff,* | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| DISTRICT OF COLUMBIA, | ) ) | |
| *Defendant.* | ) ) | |

---

### FIRST AMENDED COMPLAINT

Comes now Plaintiff, Tabitha Alberti (hereinafter "Plaintiff"), by and through undersigned counsel with her First Amended Complaint for compensatory and injunctive relief, and states as follows:

### INTRODUCTION

Plaintiff serves as a police officer with the Metropolitan Police Department (hereinafter "MPD"), and has been in that role since 2006. While she was at the police academy, Plaintiff was sexually harassed, and had the courage to report the matter while she was still a cadet. Sadly, but consistently with longstanding MPD culture, Plaintiff was not taken seriously, and was targeted and labeled as a snitch or problem child for having complained. From her first assignment on, Plaintiff has been the subject of systematic harassment, bullying, denigration, intimidation and retaliation for having complained about sexual harassment. Herein she alleges claims related to the hostile work environment to which she has been subject since her first sexual harassment complaint, and clearly explains how the stigma that was placed on her for her first act of resistance to sexual harassment followed her throughout her tenure at MPD.

1

Plaintiff also alleges that every act of sexual harassment is -- in and of itself -- a form of disparate treatment. As such, every time Defendant allowed Plaintiff's colleagues to make sexual comments to her, to attempt to flirt with her, to make her the butt of sexualized jokes, or to speculate about her sexuality or sexual orientation, Defendant enabled disparate treatment based on sex and perceived sexual orientation. It is never appropriate for workers in a modern workplace to treat their colleagues as their chief source of entertainment or their principal dating pool. And yet, MPD created the circumstances in which Plaintiff's colleagues believed it acceptable to make comments about her body, her dating habits, and her sex life on a daily basis. By allowing this to happen, Defendant subjected Plaintiff to disparate terms and conditions of employment based on sex and sexual orientation.

Plaintiff also alleges that she was retaliated against because she opposed and complained about the disparate treatment and hostile work environment she was forced to endure. Plaintiff was retaliated against by being subjected to systematic retaliation that is deeply ensconced in the culture of MPD for complaining about a fellow officer. As explained herein, MPD management routinely directs or enables systematic, multi-pronged retaliation against officers it seeks to push out of the department. This sort of ganging-up on officers can take place because the officer irritated management, or because she irritated other officers who are well liked or supported by their colleagues or by police union officials. Plaintiff alleges that she was subjected to a retaliatory hostile work environment that tarried for *years* because she irritated male colleagues when she reported their unprofessional and unlawful conduct.

Plaintiff also alleges herein that she was retaliated against by management when she was denied promotions, job opportunities, transfers and other material actions related to her job. Some of these actions amounted to adverse actions, while others were simply sufficiently deleterious to discourage others from complaining, and to serve as a deterrent to Plaintiff from any further

complaints.

Plaintiff brings claims pursuant to the Civil Rights Act of 1967, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act, (hereinafter "DCHRA") D.C. Code § 2-1401.01 *et seq.*, and the District of Columbia Whistleblower Protection Act, D.C. Code § 1–615.51 *et seq.*, and sues her employer for damages of not less than $6,000,000.00 plus interest, fees, attorneys fees, costs and all other appropriate remedies.

## PARTIES

1.    Plaintiff is employed by MPD as a police officer, and has been in that role since July 24, 2006.  She is a resident of the state of Maryland, and is a member of protected classes in that she is both female and is perceived by the colleagues who harass her to be a member of the LGBTQ community.

2.    Defendant Metropolitan Defendant District of Columbia is a municipality. MPD is a department of that municipality, under the control of the Mayor of the District of Columbia, and its City Council.

## JURISDICTION AND VENUE

3.    This Court enjoys jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under federal law, including but not limited to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, which prohibits employment discrimination on the basis of sex and retaliation against employees who engage in protected activity.

4.    This Court also has supplemental jurisdiction over Plaintiff's claims arising under the laws of the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 et seq. pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal claims that they form part of the same case or controversy.

5.    Venue is proper in the District of Columbia under 28 U.S.C. § 1331 and 29 U.S.C. § 1402

because substantially all the acts and omissions that give rise to this complaint occurred in the District of Columbia. Venue properly lies within this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3). This Court is also the proper venue to adjudicate Plaintiff's state law claims. Plaintiff has exhausted all administrative remedies as required by law, including filing a timely complaint with the Metropolitan Police Department's Equal Employment Opportunity Office and obtaining a determination of the complaint, as detailed herein. Plaintiff now seeks judicial relief as provided by law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.     On or around December 21, 2023, Plaintiff filed EEOC charge #570-2024-06016 and #570-2024-01063. Therein, she timely asserted claims for discrimination based on race, gender, sexual orientation, perceived sexual orientation, and retaliation.

7.     On or around August 20, 2024, Plaintiff received her Notice of the Right to Sue letter.

8.     Plaintiff has fully exhausted her administrative remedies and has timely filed the instant suit before this Court.

## RELEVANT FACTS

9.     Plaintiff is a female who has been employed as a police officer with MPD since July of 2006.

10.    MPD, as an institution, has a pervasive culture of bullying and retribution against officers who complain about the behavior or misconduct of their fellow officers.

11.    Much of this culture is enforced by and between officers, to ensure loyalty to each other, rather than to the public. Many scholars have called this culture "the blue code of silence."

12.    A core element of the blue code of silence is not reporting interpersonal transgressions that can ruin an officer's career, and top of that list is not to report sexual harassment and gender discrimination.

4

13.    Gender discrimination is extremely prevalent in policing because it is a traditionally male vocation, and many officers do not believe that women should be in roles that can sometimes require physical strength.

14.    Statistically, however, women officers are less likely to engage excessive use of force or in officer misconduct.

15.    For years, MPD has had a culture that tolerated denigrating comments about women, and overtly sexual commentary. This type of language was often excused as "locker room talk," or just harmless banter.

16.    Plaintiff asserts that MPD has done very little to mitigate or alter the culture of male officers harassing, humiliating, and denigrating women.

17.    Plaintiff asserts that this culture of devaluing women originates with the Chief of Police, who is responsible for the culture of the entire enterprise.

18.    MPD Chiefs of Police have final say in the discipline of any police officer, or put another way, an MPD police officer will not be disciplined without the Chief of Police's direct or indirect approval.

19.    Conversely, the Chiefs of Police routinely and regularly protect those whom they favor from disciplinary action, as well as easing their career paths by engaging in favoritism in assignments and promotional opportunities.

20.    When an MPD Chief of Police decides that he or she no longer wants an officer to be employed by the MPD, the Chief orchestrates and coordinates a campaign to push that officer out.

21.    Officers who are no longer welcome at the MPD because they have opposed or complained about race or gender discrimination and retaliation, are hyper-scrutinized (or "bird-dogged") by their immediate supervisors for every kind of minor issue or transgression, and are made to feel like they are walking on eggshells.

22.    This practice is so prevalent, and is such a part of the culture, that MPD officers have a slang term for it: "being hot."

23.    When an officer is described as "being hot," by and amongst other officers, it means that the officer has been targeted for reprisal and punitive treatment. The term is used as a warning to steer clear of that officer to avoid being collaterally damaged by the intentional retaliation aimed at the targeted officer.

24.    When the management team of a division decides to move an employee out of MPD, they use the phrase "baking a cake" on that person, which essentially means that different officials bring different "ingredients" (i.e. disciplinary and administrative actions) against the person to formulate a broad-based attack on that person.

25.    For the duration of the relevant period, MPD Chiefs of Police have been aware of, and have directed their subordinates to execute campaigns that target an individual officer for removal from MPD.

26.    Women officers have been disproportionately targeted for such campaigns of bullying, isolation, harassment and retaliation for complaining about gender discrimination, or for reporting sexual harassment.

27.    Officers who become the subject of such campaigns are made to feel unwelcome and like second class citizens.

28.    IAD targets and investigates officers who opposed discrimination or complain about, or reported, misconduct, while simultaneously ignoring the complaints from women when they are victimized by coordinated retaliation.

29.    MPD Police Chiefs are extremely effective in fashioning and executing these coordinated campaigns to bully, harass and retaliate against women police officers, which causes a disproportionate number of them to resign or retire early.

30.    Women who are targeted for retaliatory harassment are falsely accused of serious misconduct and made to defend themselves against often-times outrageous accusations. When those accusations are proven to be unfounded, there is no redress of any kind.

31.    Women police officers with years of positive service to the MPD, once they become the subject of a targeted bullying campaign, are found to be deficient in every category of performance, with no explanation as to what caused the purported dramatic decline in performance.

32.    Women officers are targeted by the Chiefs of Police in such a fashion are bullied and harassed to such an extent that it adversely affects their mental and physical health, and places them in a position in which leaving the MPD becomes the only way in which they can protect their mental and physical wellbeing.

33.    The design and intention of the coordinated attacks by MPD Chiefs of Police and their agents is to make women who oppose gender discrimination feel as if there is an incessant onslaught of harassment and bullying against them, that chokes the life out of their professional competencies and emotional strength such that it becomes easier to simply give up.

34.    MPD Chiefs of Police approve of, and use, such tactics for unlawful purposes and disproportionately against women officers.

35.    In 2006, while attending the police academy, Plaintiff reported sexual harassment in the form of extreme undue interest from fellow recruit Matthew Burke (hereinafter "Recruit Burke") to Sergeants Ashley Rosenthal (hereinafter "Sgt. Rosenthal") and class officer Gary Nelson hereinafter ("CO Nelson").

36.    At the academy, MPD nurtured a culture in which male recruits felt like they could say anything to female recruits with impunity.

37.    Although Plaintiff did nothing to invite attention from Recruit Burke, he continuously made comments about wanting to have sexual relations with her, which was extremely

embarrassing and humiliating to Plaintiff.

38.     This included multiple occasions in which Recruit Burke told other recruits he was going to "make Plaintiff his girlfriend" despite her rebukes, and telling her "She will cave eventually."

39.     Additionally, Recruit Burke placed notes on Plaintiff's personal vehicle stating that he was going to make her his girlfriend in the future and bragged to other recruits that he was hiring someone from Baltimore to break-in to Plaintiff's apartment so that she "would want a man around."

40.     These notes were extremely threatening to Plaintiff, because they implied that if she was raped by a man, she would somehow desire sex with him in the future. The notes and comments were disgusting, demeaning and extremely threatening.

41.     The context and undertone of Recruit Burke's harassment of Plaintiff was that several recruits had speculated about Plaintiff's sexual orientation, and there were rumors that she was a lesbian.

42.     Plaintiff ignored these rumors, but believes that this speculation played a role in Recruit Burke thinking that sex with a man who broke into her apartment would somehow "cure" her, or make her see the light.

43.     Plaintiff reported Recruit Burke's behavior to CO Nelson, but instead of referring Plaintiff to the EEO department, CO Nelson referred Plaintiff to Sergeant Rosenthal.

44.     At the end of October 2006, Plaintiff met with Sgt. Rosenthal in the Sergeant's office at the academy, at which time Sgt. Rosenthal intimated that Plaintiff was making a big deal out of nothing, and that Plaintiff's problem was that thought she was "cute."

45.     Sgt. Rosenthal did not refer Plaintiff to EEO or escalate the matter to any police academy senior leaders.

46.     Plaintiff asserts that she engaged in protected activity when she reported the sexual

harassment she was enduring in the academy.

47.    Instead of addressing the harassment, academy instructors labeled Plaintiff a "problem child" and initiated a campaign of disparate treatment and retaliation against Plaintiff that carries on until the present.

48.    Within hours of making her complaint to Sgt. Rosenthal, all of Plaintiff's academy classmates were aware that she had made a complaint against Recruit Burke. This became a major topic of conversation between and amongst cadets.

49.    When Plaintiff was labeled a "problem child," this designation did not remain in the academy. When Plaintiff's classmates left the academy to join units throughout MPD, they perpetuated rumors about Plaintiff, and gave her a negative reputation with officers she had never met or worked with.

50.    More importantly, Plaintiff was retaliated against for having complained about sexual harassment, by being removed from the class.

51.    Approximately one week from when she complained about sexual harassment, Plaintiff was removed from her class, and was not allowed to graduate with the other recruits.

52.    At the time that Plaintiff was removed from the class, she was performing well and did not have any disciplinary matters against her.

53.    Upon information and belief, no disciplinary action was taken against Recruit Burke.

54.    MPD's justification for this adverse personnel action was that it was separating Plaintiff from the offender by putting her in another class. However, this explanation made no sense because the offender remained with his class while the victim was punished and had to move to a later graduating class.

55.    Being held back in the academy has a negative connotation because it is often assumed that the action was due to a performance deficiency. Moreover, being held back had a negative

financial impact on Plaintiff.

56.     Importantly, by punishing Plaintiff, rather than Recruit Burke, MPD sent the clear message to all of the department that Plaintiff was the problem and a less valuable person to MPD than Recruit Burke.

57.     Defendant's initial act of disparate treatment and retaliation against Plaintiff set off a series of events, and set the tone for her tenure at MPD that invited and fostered a hostile work environment for her.

58.     Because Plaintiff was a probationary employee at that time, she had no appeal rights or redress for the retaliation she was subjected to.

59.     Having no other option, Plaintiff went into the next recruit class and tried to make the best of a terrible situation.

60.     Despite that effort, in the new class Plaintiff was again labeled a "problem child" because she reported sexual harassment.

61.     The instructors in the second class targeted Plaintiff for public humiliation, often openly discussing why Plaintiff had been moved into the class in front of other recruits and suggesting that she was the issue, not the behavior of Recruit Burke.

62.     Course leaders also subjected Plaintiff to punitive physical exercise that often took place while the other recruits were not punished, so that Plaintiff's classmates would watch as Plaintiff was forced to do sexualized exercises in front of them.

63.     An example of this is when Plaintiff was brought in front of the class and ridiculed for her past complaint because "she clearly believed she was so cute." The instructor had the males face her while she faced the wall and did squats with her buttocks toward the other cadets watching.

64.     On another occasion Plaintiff was forced to clean the male shower area, which was ridiculous and humiliating.   Male recruits were never made to clean the female shower area for

any reason.

65.     Due to the constant harassment for having engaged in protected activity in opposing the sexual harassment of her classmate, Plaintiff was reduced to being recycled and evaluated as a poor performer, even though Plaintiff had been the "class leader" of her original class and won an award for physical fitness.

66.     The academy instructors continued to punish Plaintiff throughout her time there, and continually belittled her in front of other recruits, punishing the class and blaming her, and even at times blatantly saying the punishment was because "Alberti believes she is cute," referring directly to Plaintiff's sexual harassment complaint.

67.     Plaintiff's humiliation at the hands of her academy instructions was constant, consistent, and sufficiently severe to interfere with her ability to learn and execute her duties.

68.     Plaintiff asserts that she was subjected to a retaliatory hostile work environment that began when she reported her classmate for sexual harassment, and that the hostile work environment continued as she moved into her policing assignments, and continues to this day.

69.     Plaintiff asserts that she was subjected to a hostile work environment at the academy due to being subjected to repeated acts of sexual harassment, and retaliation for having complained about sexual harassment.

70.     In February 2007, Plaintiff graduated from the academy and was assigned to the Sixth District (hereinafter "6D").

71.     Plaintiff's instructors made clear to her that she was being assigned to a dangerous or undesirable neighborhood on purpose, and in an effort to intimidate and retaliate against her, when they said words to the effect of: "You are going east of the river to see if you can survive the hood."

72.     Plaintiff asserts that this type of commentary was grounded in the sexist belief that women officers are easily frightened, and always seeking easy assignments, and demonstrates a sexist

11

culture at MPD.

73.     Plaintiff also asserts that the giddiness and glee that her supervisors demonstrated when announcing the whole class that Plaintiff was being assigned to the least desirable assignment, further demonstrated their animus towards her.

74.     Plaintiff not only survived at 6D she exceled in the position. By 2008, she had earned a spot on the division's elite Vice Narcotics Unit (hereinafter "VNU").

75.     But despite the fact that she was doing well in her actual duties, Plaintiff was still being subjected to negative comments about the fact that she had reported a classmate for sexual harassment.

76.     Moreover, despite the fact that MPD was aware of the fact that Recruit Burke had sexually harassed Plaintiff, it assigned then Officer Burke to 6D to work with Plaintiff.

77.     Another person with whom Plaintiff had particular issues at 6D, was Officer Joseph Campbell (hereinafter "Off. Campbell").

78.     Not long after she began working with Officers Burke and Campbell at 6D, Plaintiff noticed that she had a negative reputation with certain of her 6D colleagues.

79.     These negative comments came from her supervisors as well as her fellow officers. Thus, Plaintiff asserts that the hostile work environment from the academy did not ever truly abate, and followed her to 6D.

80.     While in the VNU of 2008-2013, Plaintiff was both a victim and witness to multiple EEO violations.

81.     On multiple occasions while Plaintiff was at the 6D VNU, Officer Campbell propositioned Plaintiff, attempted to flirt with Plaintiff, and made clear he had a romantic/sexual interest in Plaintiff.

82.     Plaintiff also witnessed other EEO violations while she was at 6D.

83.    For example, in March of 2011, Officer Joseph Tridico (hereinafter "Off. Tridico") filed an EEO complaint regarding religious discrimination, listing Plaintiff as a witness.

84.    Plaintiff arrived at the VNU after Off. Tridico, and as soon as she said something to the other officers in the unit about the way they treated Off. Tridico, she became a target as well.

85.    During this time, Plaintiff did not file a formal complaint for fear of reprisal after what occurred during her time at the academy.

86.    However, she was regularly disrespected, treated inhumanely, and was often questioned regarding her sexuality.

87.    Plaintiff never responded to inquiries about her sexual orientation, which, sadly, caused rumors and speculation about her sexual orientation to flourish.

88.    It took three years for Off. Tridico's EEO claim to be processed, and in 2014, Plaintiff testified on behalf of Officer Tridico during his trial (*Tridico* v. *District of Columbia*).

89.    In the *Tridico* case, Plaintiff testified against Officer Lee Schefman (hereinafter "Off. Schefman") for bullying and discriminating against Off. Tridico.

90.    Immediately after engaging in the protected activity of participating in a court hearing and testifying against an MPD officer, Plaintiff was removed from the unit, and involuntarily transferred to Second District (hereinafter "2D").

91.    Plaintiff notes that she did not have any performance issues at 6D until she testified on Officer Tridico's behalf.

92.    Once it was known that Plaintiff testified at Off. Tridico's trial, she was repeatedly retaliated against and targeted for frivolous disciplinary write-ups by the Sergeants in her unit.

93.    In February of 2022, years after the Tridico case, Off. Schefman was transferred to 2D when he was promoted to the rank of Sergeant (hereinafter "Sgt. Schefman"). Thus, Plaintiff ended up working directly for the person against whom she testified in the Tridico case.

94.    Almost immediately after Sgt. Schefman reported to 2D, he began to retaliate against Plaintiff, and to poison Plaintiff's colleagues against her.

95.    Within two months of his arrival, Sgt. Schefman wrote up Plaintiff for refusing to make herself available for a call, when the issue was actually a technical problem with the computer in her vehicle.

96.    As Plaintiff was walking by the administrative office to upload her body-worn camera data, she overheard Sgt. Schefman telling other officers that Plaintiff "has always been a problem" or words to that effect.

97.    Sgt. Schefman went so far as to ask an officer to verify if the computer in Plaintiff's vehicle was working, and was disgruntled when he found out that Plaintiff had been telling the truth.

98.    Plaintiff's tenure at 2D has since become a nightmare of harassment, insults and humiliations, attacks on her character and reliability, and worst of all, constant comments about her perceived sexuality.

99.    The problem became so persistent, that on or about September 20, 2022, Plaintiff sought a meeting with the unit's Commander Duncan Bedlion (hereinafter "Cdr. Bedlion").

100.    At that conference, Plaintiff requested a transfer to a different unit within 2D because she continued to experience targeted retaliation and harassment from other officers who were aware of her history.

101.    One day after the conference, Plaintiff was written up by Sgt. Nicholas Kunez (hereinafter "Sgt. Kunez"), for a uniform violation. However, Plaintiff suffered from a rash on her sternum and chest areas from the Teflon, and had a medical note allowing her to modify the uniform.

102.    Plaintiff was still written up by Sgt. Kunez because she did not have her documentation with her at the time that Sgt. Kunez confronted her.

103.    Male officers often had similar medical waivers for shaving but were never written up or

required to carry medical notes with them.

104.    As a result of this frivolous disciplinary action, Plaintiff was suspended and lost pay until the decision was overturned in August of 2022.

105.    On appeal, and after an extensive investigation, Plaintiff was exonerated of the charge.

106.    Nevertheless, Plaintiff was seriously affected by the disparate and unfair disciplinary action, which negatively impacted her work assignments and blocked her ability to earn overtime pay, and to be considered for promotion.

107.    Plaintiff asserts that she lost more than $1000 in overtime pay due to the frivolous discipline against her.

108.    At some time, Off. Campbell was transferred to 2D where Plaintiff was working, and unfortunately, he picked up where he left off, pursuing a sexual relationship with Plaintiff, and making repeated unwanted advances on her.

109.    For example, on multiple occasions, while Plaintiff was waiting for a vehicle after roll call, Off. Campbell would attempt to engage Plaintiff in conversations about his sex life with his wife, whom he claimed was a swinger, and invited Plaintiff to join them at sex clubs in Baltimore.

110.    On other occasions, Off. Campbell tried to show Plaintiff sexual videos sent to him by his wife, suggesting that Plaintiff would find them arousing.

111.    When Plaintiff expressed disgust, or a lack of interest, Off. Campbell would laugh uproariously, making Plaintiff the butt of his joke.

112.    When Plaintiff rejected his advances, Off. Campbell began making extremely outrageous, derogatory, and inappropriate comments about Plaintiff's sexual orientation, such as "you must be dumb, you must be gay" and on more than one occasion referred to Plaintiff as a "fucking dyke" in front of other officers.

113.    On repeated occasions, Off. Campbell accused Plaintiff of not wanting to have a relationship

with him because she was a lesbian. Off. Campbell would make these comments in front of other officers, which was humiliating to Plaintiff.

114.   On at least five occasions in 2022, Plaintiff complained to Sergeant Phillip Robinson (hereinafter "Sgt. Robinson"), her immediate supervisor, about Off. Campbell's behavior, and each time Sgt. Robinson did nothing.

115.   In 2022, Plaintiff opted not to file an EEO complaint because the EEO Department was controlled by Alphonso Lee, who had a notorious reputation of being anti-woman. Several female MPD employees had filed complaints against him, and his own EEO counselors had filed a lawsuit alleging that he was undermining claims of sexual harassment. So Plaintiff knew her complaint would not be taken seriously.

116.   Sgt. Robinson did not initiate any kind of investigation into Off. Campbell based on any of Plaintiff's complaints.

117.   Plaintiff's reports to Sgt. Robison constituted activity protected by Title VII, the DCHRA and the DC Whistleblower Protection Act.

118.   Although Plaintiff had been complaining to her supervisors about Off. Campbell's behavior, she escalated matters in the beginning of 2023.

119.   In early 2023, Plaintiff met directly with Chief of Police Pamela Smith (hereinafter Chief Smith) in the Chief's office to specifically complain about the sexual harassment Plaintiff was being subjected to.

120.   Plaintiff asserts that Chief Smith is an ultimate decision maker who has the authority to bind the District of Columbia.

121.   Plaintiff raised several issues including the fact that despite testifying that Sgt. Schefman had engaged in bullying and hazing against another officer, Sgt. Schefman was both promoted and placed in authority over Plaintiff.

122.    Chief Smith's response was that she was unaware of the fact that Sgt. Schefman had been accused of serious wrongdoing, and that she would not have transferred Sgt. Schefman to 2D had she known his history.

123.    However, upon learning about Sgt. Schefman had done from Plaintiff, Chief Smith took no remedial steps or actions.  Sgt. Schefman was left in a position where he had direct control over Plaintiff.

124.    Chief Smith also took no action to address the sexual harassment that Plaintiff was enduring.

125.    Rather, Chief Smith referred Plaintiff to the EEO department, and despite her concerns about Mr. Lee and the dysfunction of the EEO department, she filed an EEO complaint.

126.    On or about July 20, 2023, Plaintiff filed a formal complaint with MPD EEO, alleging that she was being sexually harassed by Off. Campbell, and also complaining about the fact that Sgt. Robinson refused to take any appropriate action.

127.    The complaint related to her years of experience with Off. Campbell in which he had asked Plaintiff out several times, made sexual advances, which continued from their time working together at 6D to 2D.

128.    Shortly after she filed the EEO complaint, Plaintiff's colleagues began discussing the fact that she had complained about Off. Campbell, which corroborated her concerns that Mr. Lee did not keep the confidentiality of complainants.

129.    Plaintiff noticed an immediate increase in the hostility towards her by her supervisors, most especially Sgt. Robinson.

130.    IS numbers were drawn in August of 2023, which indicated that the matter was being investigated by Internal Affairs.

131.    Plaintiff's formal complaint was investigated, and sustained on November 28, 2023, as

confirmed by the Executive Office of the Chief of Police.

132.    As a result of having filed a complaint against Off. Campbell and Sgt. Robinson, Plaintiff was specifically retaliated against by being disciplined for failing to "follow departmental guidelines."

133.    Just weeks after her complaint was corroborated, on January 14, 2024, Sgt. Robinson issued Plaintiff an unwarranted counseling letter for allegedly not coming into service in a timely fashion.

134.    The incident involved Plaintiff not having access to her assigned vehicle because someone else had it, and had not responded back from a hospital detail.  There was literally nothing Plaintiff could have to done to fix the situation.

135.    This disciplinary action was retaliatory, as no other officers in similar situations were disciplined or counseled by Sgt. Robinson for the same transgression, which is very common as noted by the union Shop Steward, Stephen Owens (hereinafter "Off. Owens.").

136.    When Off. Owens reached out to Sgt. Robinson, Sgt. Robinson quickly realized his mistake and wrote up Officers Michaelangelo Matthews and Officer Che Allen for the same offense, in order to cover up the disparate treatment.

137.    Sgt. Robinson had to call the male officers late into their tour to manufacture a basis to write them up for the transgression for which he wrote up Plaintiff.

138.    Up until that point, no one was being disciplined for the alleged transgression that Plaintiff was disciplined for, and no one has been disciplined for it since that time.

139.    These facts make clear that Sgt. Robinson had targeted Plaintiff for disparate disciplinary treatment, and wrote up the other officers to cover his tracks.  Sgt. Robinson's intention was to single Plaintiff out for discipline.

140.    On several occasions in 2023 and 2024, Plaintiff was unfairly singled out for the most

dangerous and demanding assignment, which is the transport of combative psychosis prisoners.

141.    Typically such assignments are evenly distributed through the department, but throughout 2023, Plaintiff was repeatedly given this assignment as a form of retaliation.

142.    Plaintiff's supervisors would also not honor Plaintiff's seniority in assignments, making her do work that was typically assigned to less senior officers, which was noted both by Plaintiff and by her colleagues as a sign of disrespect.

143.    Plaintiff's supervisors assigned her to either dangerous tasks or menial tasks routinely, in an effort to demonstrate their displeasure with her for complaining about her fellow officers.

144.    Plaintiff supervisors frequently left her as the sole officer responsible for patrolling the busiest areas, while other officers were assigned less strenuous tasks or diverted to other duties.

145.    Plaintiff was also the only person assigned tasks reserved for female officers when there were other female officers on duty. Again, this was inequitable distribution of duties designed to divorce Plaintiff of privileges of her seniority.

146.    In February 2024, Plaintiff raised concerns about Off. Campbell's failure to respond to his calls and assignments in a timely manner (in essence, doing the exact same thing for which she was disciplined).

147.    Instead of addressing her concerns, her supervisors, including Lieutenant John Merzig (hereinafter "Lt. Merzig") and Sergeant James Koenig (hereinafter "Sgt. Koenig"), disregarded her complaints and accused Plaintiff of "following" or surveilling Off. Campbell.

148.    On April 11, 2024, Plaintiff was issued another counseling letter, this time by Sergeant Darnell Benton (hereinafter "Sgt. Benton"), after Plaintiff tried to use the designated report writing room's computer to file a report because the computer in her vehicle was not working.

149.    Despite her efforts to complete her duties, Sgt. Benton humiliated her in front of her peers and used overly aggressive language publicly ordering her back into service, leading to further

emotional distress and professional embarrassment.

150.    Specifically, Sgt. Benton yelled in Plaintiff's face and loudly cursed and yelled at her to return to service despite Plaintiff's request not to yell at her publicly because she is a human being.

151.    This incident was extremely humiliating and undermined Plaintiff in front of her colleagues.

152.    This incident was observed by Sgt. Kenny Brown (hereinafter "Sgt. Brown"), who followed Plaintiff after the incident to check on her well-being because the incident was so egregious.

153.    To add to the pile-on of write-ups, Sgt. Shefman also issued a counseling letter that day against Plaintiff, falsely claiming that she refused to come into service with her midnight partner.

154.    This action was not only retaliation for her complaint, but also related to Plaintiff's testimony against Sgt. Schefman in the *Tridico* case.

155.    In July of 2024, Plaintiff reached out to Commander Tatjana Savoy (hereinafter "Cdr. Savoy") requesting to be removed from working with Off. Campbell and Sgt. Shefman, due to her concerns for her safety, but the request was denied.

156.    Despite having formal complaints filed against them, Off. Campbell was promoted to a preferred unit (SOD Motor Tac), and Sgt. Shefman received a prestigious award, which proves that MPD does not take complaints of sexual harassment seriously.

157.    Throughout 2024, Plaintiff has been subjected to multiple counseling letters and reprimands, which were issued as part of a scheme to retaliate against her for her protected activity.

158.    These letters were based on fabricated or exaggerated incidents and were aimed at undermining her professional standing within the department.

159.    Plaintiff asserts that it is entirely consistent with MPD's culture, and pattern and practice, to target whistleblowers with a series of small disciplinary actions that ultimately culminate in their emotional exhaustion and frustration, and lead to larger discipliner or termination for poor

performance.

160.    As alleged above, this sort of intentional creation of a hostile work environment for officers who displease management is so common it has a nickname "being hot."

161.    Several of Plaintiff's colleagues expressed concern working with her because she was so frequently targeted for scrutiny and discipline by management, and they feared becoming collateral damage. This directly impacted Plaintiff's safety while executing her duties.

162.    As a result of the sustained harassment and retaliatory actions, Plaintiff has been subject to a continuing and ongoing hostile work environment that impeded her ability to execute her duties, hampered her relationships with her colleagues, and stymied her job development and promotion opportunities.

163.    Despite her qualifications and experience, Plaintiff has been repeatedly overlooked for various positions and promotions within the MPD, including Field Training Officer, Property Clerk, and School Resource Officer, further exacerbating the impact of the hostile work environment to which Plaintiff was subject.

164.    For example, she was denied the following positions on the corresponding dates: Property Clerk on October 2, 2016, and February 1, 2024; Field Training Officer on February 8, 2017, May 25, 2017, and October 2, 2018; Station Clerk on February 8, 2023; CPO/TPO Officer January 16, 2019; Paternity Support Unit on January 24, 2019; Youth and Family Officer on January 29, 2019; School Resource Officer on January 31, 2019, and January 4, 2024; Segway Beat Officer September 14, 2017, October 23, 2016, March 16, 2017, and April 15, 2018, and Investigator on October 29, 2019.

165.    In September of 2023, Plaintiff took the promotion exam to Sergeant for the fourth time. Plaintiff scored well enough to be promoted.

166.    Plaintiff was not included in the first batch of promotions in December of 2023.

167.    Plaintiff was also skipped in the second batch of promotions in February of 2024.

168.    By April of 2024, Plaintiff was the next name on the list to be promoted to sergeant, and instead MPD decided to comingle the remaining names on the list with name from a previous year's list that had expired in August of 2023.

169.    The effect of this decision was to move Plaintiff out of her next in line position, and to allow MPD to promote others ahead of her.

170.    There was no reason or justification for promoting names from an expired list other than to avoid promoting Plaintiff.

171.    Plaintiff further specifically asserts that she was hampered in her ability to execute her duties due to the harassment, which included not being given vital information by her colleagues and Sergeants needed to execute her duties.

172.    For example, during one particular shift change in the winter of 2023, Plaintiff, who was the crisis intervention officer, was sent to a scene that had been handled by the previous shift, without being told that the patient was homicidal and suicidal.

173.    This failure to provide her vital information placed Plaintiff in extreme danger. Unfortunately, this was not an isolated incident.  Plaintiff often found herself flying blind into situations because the watch commander sergeants refused to share information with her.

174.    Plaintiff was subjected to constant, near daily insults about her appearance, her sexual habits and practices, and her gender expression.

175.    Plaintiff was made the butt of the joke so often, that she tried to avoid being in the same room with the officers who constantly harassed her.

176.    Plaintiff was severely impacted by the hostile work environment to which she was subjected. It caused Plaintiff severe emotional stress, anxiety, depression, sleeplessness and constant fear, which caused Plaintiff to have to seek professional mental health counseling.

177.    Plaintiff also suffered physical symptoms including weight gain, hair loss and high blood pressure was treated by prescription medication.

178.    Plaintiff has made multiple attempts to seek redress and protection from her supervisors and the MPD, but her complaints have been consistently dismissed or ignored.

179.    As a result of the MPD's failure to address the ongoing retaliation and hostile work environment, Officer Alberti seeks redress for the harm she has suffered, including but not limited to, emotional distress, career damage, and loss of professional opportunities.

## CLAIMS

### COUNTS I & II

*(VIOLATION OF TITLE VII OF*
*THE CIVIL RIGHTS ACT OF 1964 42 U.S.C. § 2000e et seq.,*
*and*
*VIOLATION OF D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,-*
*Gender Based Hostile Work Environment/Ongoing Sexual Harassment)*

180.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

181.    Plaintiff is an employee within the meaning of Title VII, and Defendant is an employer within the meaning of Title VII.

182.    Plaintiff is also an employee covered by the DCHRA.

183.    Plaintiff is a member of a protected class, female.

184.    Plaintiff has faced pervasive and continuous harassment based on her sex, creating a hostile work environment and severe emotional distress.

185.    This harassment originated from colleagues and supervisors, including derogatory and sexualized comments, excessive scrutiny, unjustified reprimands, and a pattern of discrimination that interfered with her ability to perform her job duties.

186.    Plaintiff engaged in protected activity under Title VII and the DCHRA by reporting incidents of sexual harassment, discrimination, and hostile treatment, which included filing formal

23

complaints with MPD's Internal Affairs Division and providing testimony against several superiors involved in a pattern of harassment and retaliation.

187.    On or around July 20, 2023, Plaintiff filed a formal EEO complaint with the Internal Affairs Division, detailing sexual harassment by Officer Joseph Campbell and retaliation from other officers, including Sgt. Schefman, whom she had previously testified against.

188.    Plaintiff's complaint was substantiated on November 28, 2023, by the Executive Office of the Chief of Police, establishing that her allegations of harassment were valid.

189.    Despite the sustained complaint, Plaintiff's supervisors and colleagues failed to take meaningful steps to protect her from further harassment or to remedy the hostile work environment.

190.    Instead, Plaintiff was subjected to retaliatory actions by several supervisors, including but not limited to, Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and Sergeant Shefman.

191.    After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: Issuing Plaintiff unwarranted counseling letters for alleged infractions that were minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; Assigning Plaintiff more difficult and demanding patrol duties compared to her peers; Dismissing Plaintiff's concerns regarding Sergeant Campbell's work-related misconduct and accusing her of inappropriate behavior without basis; allowing the continued derogatory and publicly humiliating treatment of Plaintiff by Sergeant Campbell, including repeated sexist and homophobic slurs; denying Plaintiff opportunities for advancement within the department, including denying multiple applications for promotions and specialized roles, in retaliation for her complaints of harassment.

192.    Defendant MPD's actions in failing to address Plaintiff's complaints of harassment and

engaging in retaliation against her for filing the complaint constitute violations of Title VII.

193.    Defendant MPD's actions created a hostile work environment by fostering a workplace where harassment and discriminatory conduct were tolerated, encouraged, and protected. This hostile environment was perpetuated through ongoing actions by supervisors, including Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and Sergeant Shefman, who systematically targeted Plaintiff with baseless disciplinary actions, harsh treatment, and career obstruction.

194.    Defendant MPD's response to Plaintiff's substantiated complaint—reassigning Plaintiff to her original patrol assignment, permitting Officer Campbell to secure a promotion, and rewarding problematic supervisors like Sergeant Schefman—demonstrates a clear failure to address the hostile work environment or to remedy ongoing retaliation.

195.    This behavior underscores MPD's institutional disregard for Plaintiff's rights and safety.

196.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

197.    Plaintiff is entitled to relief under Title VII, including compensatory damages, back pay, front pay, and attorney's fees of not less than $300,000.00, for Defendant MPD's willful and unlawful retaliation via creating a hostile work environment for Plaintiff.

198.    Plaintiff is also entitled to damages pursuant to the DCHRA, and is seeking damages no less than $1,000,000.00, including costs, fees, attorney's fees, interest and all other remedies deemed appropriate by the Court.

199.    Plaintiff also seeks any and all injunctive or declaratory relief the Court deems appropriate to abate future acts of sexual harassment and discrimination at MPD.

## COUNTS III & IV

*(VIOLATION OF TITLE VII OF*
*THE CIVIL RIGHTS ACT OF 1964 42 U.S.C. § 2000e et seq,*
*and*
*VIOLATION OF D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,--*
*Ongoing Retaliatory Hostile Work Environment )*

200.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

201.    Plaintiff is an employee within the meaning of Title VII, and Defendant is an employer within the meaning of Title VII.

202.    Plaintiff is an employee covered by the DCHRA.

203.    Plaintiff is a member of a protected class, female.

204.    In 2006, Plaintiff engaged in protected activity under Title VII and the DCHRA by reporting incidents of sexual harassment, discrimination, and hostile treatment.

205.    From that point onward, Plaintiff was labeled a problem child, was told she was making a big deal out of nothing, and was immediately retaliated against by being removed from her class.

206.    That retaliatory action established Defendant's hatred and disdain for persons who report sexual harassment, and touched off a campaign to harm and retaliate against Plaintiff that has been continuous and ongoing as described in the facts above.

207.    Plaintiff engaged in protected activity in 2014, when she provided testimony against several superiors, including Sgt. Schefman, who were involved in a pattern of harassment and retaliation.

208.    In July of 2023, Plaintiff filed a formal EEO complaint with the Internal Affairs Division, detailing sexual harassment by Off. Campbell and retaliation from other officers, including Sgt. Schefman, whom she had previously testified against.

209.    Plaintiff's complaint was substantiated on November 28, 2023, by the Executive Office of the Chief of Police, establishing that her allegations of harassment were valid.

210.    Despite the sustained complaint, Plaintiff's supervisors and colleagues failed to take meaningful steps to protect her from further harassment or to remedy the hostile work environment.

211.    Instead, Plaintiff was subjected to retaliatory actions by several supervisors, including but not limited to, Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and Sgt. Shefman.

212.    After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: Issuing Plaintiff unwarranted counseling letters for alleged infractions that were minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; assigning Plaintiff more difficult and demanding patrol duties compared to her peers; dismissing Plaintiff's concerns regarding Sergeant Campbell's work-related misconduct and accusing her of inappropriate behavior without basis; allowing the continued derogatory and publicly humiliating treatment of Plaintiff by Sergeant Campbell, including repeated sexist and homophobic slurs; denying Plaintiff opportunities for advancement within the department, including denying multiple applications for promotions and specialized roles, in retaliation for her complaints of harassment.

213.    In the aggregate, Defendant's actions and refusals to act, have created a hostile work environment by fostering a workplace where harassment and discriminatory conduct were tolerated, encouraged, and protected. This hostile environment was perpetuated through ongoing actions by supervisors, who systematically targeted Plaintiff with baseless disciplinary actions, harsh treatment, and career obstruction.

214.    This behavior underscores MPD's institutional disregard for Plaintiff's rights and safety.

215.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited

to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

216.    Plaintiff is entitled to relief under Title VII, including compensatory damages, back pay, front pay, and attorney's fees of not less than $300,000.00, for Defendant MPD's willful and unlawful retaliation via creating a hostile work environment for Plaintiff.

217.    Plaintiff is also entitled to damages pursuant to the DCHRA, and is seeking damages no less than $1,000,000.00, including costs, fees, attorney's fees, interest and all other remedies deemed appropriate by the Court.

218.    Plaintiff also seeks any and all injunctive or declaratory relief the Court deems appropriate to abate future acts of sexual harassment and discrimination at MPD.

### COUNTS V & VI

*(VIOLATION OF TITLE VII OF*
*THE CIVIL RIGHTS ACT OF 1964 42 U.S.C. § 2000e et seq.*
*and*
*VIOLATION OF D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,--*
*Gender Based Disparate Treatment)*

219.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

220.    Plaintiff is a member of a protected class based on her gender (female).

221.    On multiple occasions during the statutory period Plaintiff was sexually harassed by Off. Campbell and Sgt. Schefter.

222.    Plaintiff reported the sexual harassment she was subjected to, and Defendant's internal investigation substantiated her claim that she was being systematically bullied and harassed.

223.    Plaintiff was discriminated against based on her sex on each and every occasion within the statutory period in which she was sexually harassed.

224.    Defendant's enabling of the sexual harassment that Plaintiff was subjected to caused her to endure disparate terms and conditions of employment based on gender.

28

225.  As a direct and proximate cause of Defendant's actions, Plaintiff suffered severe mental and emotional anguish that caused her to require the assistance of health care providers.

226.  Plaintiff now seeks damages in the amount of not less than $300,000.00, plus costs, fees, interest, attorney's fees and all other damages the Court deems appropriate.

227.  Plaintiff is also entitled to damages pursuant to the DCHRA, and is seeking damages no less than $1,000,000.00, including costs, fees, attorney's fees, interest and all other remedies deemed appropriate by the Court.

228.  Plaintiff also seeks any and all injunctive or declaratory relief the Court deems appropriate to abate future acts of sexual harassment and discrimination at MPD.

### COUNT VII & VIII

*(VIOLATION OF TITLE VII OF*
*THE CIVIL RIGHTS ACT OF 1964 42 U.S.C. § 2000e et seq.*
*and*
*VIOLATION OF D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,--*
*Retaliatory Disparate Treatment )*

229.  Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

230.  Plaintiff is a member of a protected class based on her gender (female).

231.  During the relevant statutory period in July of 2023, Plaintiff filed a formal EEO complaint with the Internal Affairs Division, detailing sexual harassment by Off. Campbell and retaliation from other officers, including Sgt. Schefman, whom she had previously testified against.

232.  Plaintiff's complaint was substantiated on November 28, 2023, by the Executive Office of the Chief of Police, establishing that her allegations of harassment were valid.

233.  Despite the sustained complaint, Plaintiff's supervisors and colleagues failed to take meaningful steps to protect her from further harassment or to remedy the hostile work environment.

234.  Instead, Plaintiff was subjected to retaliatory actions by several supervisors, including but not limited to, Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and

Sergeant Shefman.

235.   After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: issuing Plaintiff unwarranted counseling letters for alleged infractions that were minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; assigning Plaintiff more difficult and demanding patrol duties compared to her peers; dismissing Plaintiff's concerns regarding Sergeant Campbell's work-related misconduct and accusing her of inappropriate behavior without basis; allowing the continued derogatory and publicly humiliating treatment of Plaintiff by Sergeant Campbell, including repeated sexist and homophobic slurs.

236.   Defendant further retaliated against Plaintiff after she filed her formal complaint by circumventing her promotion to Sergeant and using an expired promotion list, rather than promoting Plaintiff.

237.   Plaintiff was subjected to unwarranted disciplinary actions, including repeated counseling letters and write-ups for minor or fabricated infractions, such as claims of uniform violations, failure to be "in service," and allegations of failure to monitor the radio.

238.   These disciplinary actions were not only baseless but were often imposed in situations where other officers did not face similar discipline for comparable or more severe conduct

239.   Additionally, Plaintiff was frequently assigned to high-risk, high-stress assignments without support, such as solo patrols in busy areas, and was often tasked with menial chores, which were not typically assigned to her male colleagues.

240.   Plaintiff was treated less favorably than similarly situated employees who had not engaged in protected activity.

241.   As a direct and proximate result of the aforementioned retaliatory disparate treatment and

Defendant's failure to address or correct this discriminatory behavior, Plaintiff has suffered severe damage to her career, emotional distress, humiliation, and impairment of her professional reputation.

242.    The actions of Defendant, by and through its agents, were willful, intentional, and carried out with reckless indifference to Plaintiff's federally protected rights, as evidenced by the pattern of discrimination and disparate treatment detailed herein.

243.    As a direct and proximate cause of Defendant's actions, Plaintiff is entitled to compensation of not less than $300,000, including fees, costs, attorney's fees, interest, and all other remedies deemed appropriate by the Court.

244.    Plaintiff is also entitled to damages pursuant to the DCHRA, and is seeking damages no less than $1,000,000.00, including costs, fees, attorney's fees, interest and all other remedies deemed appropriate by the Court.

245.    Plaintiff also seeks any and all injunctive or declaratory relief the Court deems appropriate to abate future acts of sexual harassment and discrimination at MPD.

### COUNT IX

*(VIOLATION OF THE DISTRICT OF COLUMBIA*
*WHISTLEBLOWER PROTECTION ACT- D.C. Code § 1–615.51 et seq.*
*Retaliatory Hostile Work Environment)*

246.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

247.    In 2006, Plaintiff engaged in protected activity under the WPA by reporting incidents of sexual harassment, discrimination, and hostile treatment to Sergeant Rosenthal at the Police Academy.

248.    At that time, Plaintiff's supervisors and colleagues were made aware of the fact that Plaintiff had reported sexual harassment.

249.    From that point onward, Plaintiff was labeled a problem child, was told she was making a

big deal out of nothing, and was immediately retaliated against by being removed from her class.

250.    That retaliatory action established Defendant's hatred and disdain for persons who report sexual harassment, and touched off a campaign to harm and retaliate against Plaintiff that has been continuous and ongoing as described in the facts above.

251.    Plaintiff engaged in WPA protected activity in 2014, when she provided testimony against several superiors, including Sgt. Schefman, who were involved in a pattern of harassment and retaliation.

252.    In July of 2023, Plaintiff filed a formal EEO complaint with the Internal Affairs Division, detailing sexual harassment by Off. Campbell and retaliation from other officers, including Sgt. Schefman, whom she had previously testified against.

253.    This EEO complaint constituted activity protected by the WPA.

254.    Plaintiff's complaint was substantiated on November 28, 2023, by the Executive Office of the Chief of Police, establishing that her allegations of harassment were valid.

255.    Despite the sustained complaint, Plaintiff's supervisors and colleagues failed to take meaningful steps to protect her from further harassment or to remedy the hostile work environment.

256.    Instead, Plaintiff was subjected to retaliatory actions by several supervisors, including but not limited to, Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and Sergeant Shefman.

257.    After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: Issuing Plaintiff unwarranted counseling letters for alleged infractions that were minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; assigning Plaintiff more difficult and demanding patrol duties compared to her peers; dismissing Plaintiff's concerns regarding Sergeant Campbell's

work-related misconduct and accusing her of inappropriate behavior without basis; allowing the continued derogatory and publicly humiliating treatment of Plaintiff by Sergeant Campbell, including repeated sexist and homophobic slurs; denying Plaintiff opportunities for advancement within the department, including denying multiple applications for promotions and specialized roles, in retaliation for her complaints of harassment.

258.    In the aggregate, Defendant's actions and refusals to act, have created a hostile work environment by fostering a workplace where harassment and discriminatory conduct were tolerated, encouraged, and protected. This hostile environment was perpetuated through ongoing actions by supervisors, who systematically targeted Plaintiff with baseless disciplinary actions, harsh treatment, and career obstruction.

259.    This behavior underscores MPD's institutional disregard for Plaintiff's rights and safety.

260.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

261.    Plaintiff is entitled to relief under Title VII, including compensatory damages, back pay, front pay, and attorney's fees of not less than $1,000,000.00, for Defendant MPD's willful and unlawful retaliation via creating a hostile work environment for Plaintiff.

### COUNT X

*(VIOLATION OF THE DISTRICT OF COLUMBIA*
*WHISTLEBLOWER PROTECTION ACT- D.C. Code § 1–615.51 et seq.*
*Retaliatory Disparate Treatment)*

262.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

263.    In July of 2023, Plaintiff filed a formal EEO complaint with the Internal Affairs Division, detailing sexual harassment by Off. Campbell and retaliation from other officers, including Sgt.

Schefman, whom she had previously testified against.

264.    This EEO complaint constituted activity protected by the WPA.

265.    Plaintiff's complaint was substantiated on November 28, 2023, by the Executive Office of the Chief of Police, establishing that her allegations of harassment were valid.

266.    Despite the sustained complaint, Plaintiff's supervisors and colleagues failed to take meaningful steps to protect her from further harassment or to remedy the hostile work environment.

267.    Instead, Plaintiff was subjected to retaliatory actions by several supervisors, including but not limited to, Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and Sgt. Shefman.

268.    After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: Issuing Plaintiff unwarranted counseling letters for alleged infractions that were minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; assigning Plaintiff more difficult and demanding patrol duties compared to her peers; dismissing Plaintiff's concerns regarding Sergeant Campbell's work-related misconduct and accusing her of inappropriate behavior without basis; allowing the continued derogatory and publicly humiliating treatment of Plaintiff by Sergeant Campbell, including repeated sexist and homophobic slurs; denying Plaintiff opportunities for advancement within the department, including denying multiple applications for promotions and specialized roles, in retaliation for her complaints of harassment.

269.    Defendant further retaliated against Plaintiff after she filed her formal complaint by circumventing her promotion to Sergeant and using an expired promotion list, rather than promoting Plaintiff.

270.    Plaintiff was subjected to unwarranted disciplinary actions, including repeated counseling

letters and write-ups for minor or fabricated infractions, such as claims of uniform violations, failure to be "in service," and allegations of failure to monitor the radio.

271.    These disciplinary actions were not only baseless but were often imposed in situations where other officers did not face similar discipline for comparable or more severe conduct

272.    Additionally, Plaintiff was frequently assigned to high-risk, high-stress assignments without support, such as solo patrols in busy areas, and was often tasked with menial chores, which were not typically assigned to her male colleagues.

273.    Plaintiff was treated less favorably than similarly situated employees who had not engaged in protected activity.

274.    As a direct and proximate result of the aforementioned retaliatory disparate treatment and Defendant's failure to address or correct this discriminatory behavior, Plaintiff has suffered severe damage to her career, emotional distress, humiliation, and impairment of her professional reputation.

275.    The actions of Defendant, by and through its agents, were willful, intentional, and carried out with reckless indifference to Plaintiff's federally protected rights, as evidenced by the pattern of discrimination and disparate treatment detailed herein.

276.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

277.    Plaintiff is entitled to relief under the WPA, including compensatory damages, back pay, front pay, and attorney's fees of not less than $1,000,000.00, for Defendant MPD's willful and unlawful retaliation against Plaintiff.

## COUNT XI

*(D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,-*
*Sexual Orientation Disparate Treatment)*

278.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

279.    Plaintiff is perceived to be a member of the LGBTQ community by her colleagues.

280.    Plaintiff alleges that she was repeatedly and consistently harassed by her coworkers because they perceived her to be a lesbian or bi-sexual.

281.    As described in the fact, Plaintiff was bullied about her sexual activities, and threated with sexual violence because her co-workers believed that sexual violence would change her sexual orientation.

282.    Plaintiff reported this harassment to her supervisor in 2006, but her complaints were ignored.

283.    Plaintiff was again harassed based on perceptions of her sexual orientation in 2023.

284.    As described above, Plaintiff was repeatedly propositioned for "swinging," and sexual acts with women by her colleague, and despite her requests that he stop, he continued making lewd comments and engaging in inappropriate conversation with Plaintiff.

285.    Plaintiff alleges that each act of harassment based on the perception of her sexual orientation constituted a violation of the DCHRA for which Defendant is liable.

286.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

287.    Plaintiff is also entitled to damages pursuant to the DCHRA, and is seeking damages no less than $1,000,000.00, including costs, fees, attorney's fees, interest and all other remedies

deemed appropriate by the Court.

288.    Plaintiff also seeks any and all injunctive or declaratory relief the Court deems appropriate to abate future acts of sexual harassment and discrimination at MPD.

## COUNT XII

*(D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,-*
*Sexual Orientation Hostile Work Environment)*

289.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

290.    Plaintiff is perceived to be a member of the LGBTQ community by her colleagues.

291.    Plaintiff has faced pervasive and continuous harassment based on perceptions of her sexual orientation, creating a hostile work environment and severe emotional distress.

292.    The comments and actions made towards Plaintiff were consistent, relentless, humiliating, degrading, intimidating and completely unprofessional.

293.    Every single time that Plaintiff complained about the way she was being treated and Defendant failed to take corrective action, Defendant violated the law.

294.    This harassment originated from colleagues and supervisors, including derogatory and sexualized comments, excessive scrutiny, unjustified reprimands, and a pattern of discrimination that interfered with her ability to perform her job duties.

295.    After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: Issuing Plaintiff unwarranted counseling letters for alleged infractions that were minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; Assigning Plaintiff more difficult and demanding patrol duties compared to her peers; Dismissing Plaintiff's concerns regarding Sergeant Campbell's work-related misconduct and accusing her of inappropriate behavior without basis; allowing the

37

continued derogatory and publicly humiliating treatment of Plaintiff by Sergeant Campbell, including repeated sexist and homophobic slurs; denying Plaintiff opportunities for advancement within the department, including denying multiple applications for promotions and specialized roles, in retaliation for her complaints of harassment.

296.    Defendant MPD's actions created a hostile work environment by fostering a workplace where harassment and discriminatory conduct were tolerated, encouraged, and protected. This hostile environment was perpetuated through ongoing actions by supervisors, including Sergeant Robinson, Sergeant Koenig, Lieutenant Merzig, Sergeant Benton, and Sergeant Shefman, who systematically targeted Plaintiff with baseless disciplinary actions, harsh treatment, and career obstruction.

297.    This behavior underscores MPD's institutional disregard for Plaintiff's rights and safety.

298.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

299.    Plaintiff is entitled to relief under Title VII, including compensatory damages, back pay, front pay, and attorney's fees of not less than $300,000.00, for Defendant MPD's willful and unlawful retaliation via creating a hostile work environment for Plaintiff.

### COUNTS XIII & XIV

*(D.C. HUMAN RIGHTS ACT (DCHRA),*
*D.C. CODE § 2-1401.01 et seq.,-*
*Sexual Orientation Retaliatory Hostile Work Environment*
*and*
*Sexual Orientation Retaliatory Disparate Treatment)*

300.    Plaintiff incorporates the allegations in the previous paragraphs as if fully restated herein.

301.    Plaintiff is an employee covered by the DCHRA.

302.    Plaintiff is perceived to be a part of the LGBTQ community by her colleagues.

303.    In 2006, Plaintiff engaged in protected activity under DCHRA by reporting incidents of sexual harassment, discrimination, and hostile treatment related to the perception that she was lesbian or bi-sexual.

304.    From that point onward, Plaintiff was labeled a problem child, was told she was making a big deal out of nothing, and was immediately retaliated against by being removed from her class.

305.    That retaliatory action established Defendant's hatred and disdain for persons who report sexual harassment, and touched off a campaign to harm and retaliate against Plaintiff that has been continuous and ongoing as described in the facts above.

306.    Plaintiff engaged in protected activity in 2014, when she provided testimony against several superiors, including Sgt. Schefman, who were involved in a pattern of harassment and retaliation.

307.    In July of 2023, Plaintiff filed a formal EEO complaint with the Internal Affairs Division, detailing sexual harassment by Off. Campbell and retaliation from other officers, including Sgt. Schefman, whom she had previously testified against.

308.    Plaintiff's complaint was substantiated on November 28, 2023, by the Executive Office of the Chief of Police, establishing that her allegations of harassment were valid.

309.    Despite the sustained complaint, Plaintiff's supervisors and colleagues failed to take meaningful steps to protect her from further harassment or to remedy the hostile work environment.

310.    Instead, Plaintiff was subjected to retaliatory actions by several supervisors, including but not limited to, Sgt. Robinson, Sgt. Koenig, Lt. Merzig, Sgt. Benton, and Sgt. Shefman.

311.    After Plaintiff filed her formal complaint of sexual harassment, Defendant MPD, through its officers and supervisors, engaged in a pattern of retaliatory conduct against Plaintiff, including but not limited to: Issuing Plaintiff unwarranted counseling letters for alleged infractions that were

minor or fabricated; targeting Plaintiff for increased scrutiny and disciplinary actions, while other similarly situated officers were not disciplined; assigning Plaintiff more difficult and demanding patrol duties compared to her peers; dismissing Plaintiff's concerns regarding Sgt. Campbell's work-related misconduct and accusing her of inappropriate behavior without basis; allowing the continued derogatory and publicly humiliating treatment of Plaintiff by Sgt. Campbell, including repeated sexist and homophobic slurs; denying Plaintiff opportunities for advancement within the department, including denying multiple applications for promotions and specialized roles, in retaliation for her complaints of harassment.

312.    In the aggregate, Defendant's actions and refusals to act, have created a hostile work environment by fostering a workplace where harassment and discriminatory conduct were tolerated, encouraged, and protected. This hostile environment was perpetuated through ongoing actions by supervisors, who systematically targeted Plaintiff with baseless disciplinary actions, harsh treatment, and career obstruction.

313.    As a direct and proximate result of Defendant MPD's unlawful conduct, Plaintiff has suffered severe emotional distress, humiliation, and professional harm, including but not limited to damage to her reputation, loss of opportunities for promotion, and an ongoing hostile work environment.

314.    Plaintiff is also entitled to damages pursuant to the DCHRA, and is seeking damages no less than $1,000,000.00 for each claim, including costs, fees, attorney's fees, interest and all other remedies deemed appropriate by the Court.

315.    Plaintiff also seeks any and all injunctive or declaratory relief the Court deems appropriate to abate future acts of sexual harassment and discrimination at MPD.

### **PRAYER FOR RELIEF**

316.    Plaintiff seeks compensatory damages of an amount not less than $10,000,000.

317.    Plaintiff asks this Court for the declaratory and injunctive relief it deems appropriate to prevent MPD from keeping Plaintiff in the same units with her harassers.

318.    Plaintiff asks this Court for declaratory and injunctive relief to mandate that Defendant take steps to curb sexual harassment and retaliation against complainants in the future.

319.    Plaintiff asks this Court for any and all other remedies, of whatever nature, it deems appropriate.

## JURY DEMAND

320.    Plaintiff demands a jury trial on claims so triable.

Respectfully submitted,

/s/*Pamela M. Keith*
Pamela M. Keith [Bar No. 448421]
Raymond K. Gordineer [Bar No. 90028057]
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiff*