**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**TABITHA ALBERTI,**

     **Plaintiff,**

       **v.**

**DISTRICT OF COLUMBIA,**

     **Defendant.**

---

**Civil Action No. 24-3219 (JEB)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Tabitha Alberti is an officer with the Metropolitan Police Department. Her tenure, in her telling, has been fraught. Going back to her days at the police academy in 2006, Plaintiff claims that she has endured sexual harassment from fellow officers, retaliation from supervisors, and an institutional culture that punishes those who speak up. After nearly two decades of alleged mistreatment, unwanted advances, and coordinated efforts to derail her career, she has brought this suit against the District of Columbia.

Alberti's claims — fourteen in all — range widely, with some alleging that she was targeted for reporting misconduct and others maintaining that she was treated differently because she is a woman or because colleagues perceived her to be a member of the LGBTQ community. Defendant now moves to dismiss on multiple grounds, contending that several claims are time barred, others fail to state a claim, and some are duplicative. Agreeing with a number of these points, the Court will grant the Motion in part and deny it in part.

1

## I.    Background

### A.  Factual Background

The Court, as it must at this stage, draws the facts from the Complaint and assumes them to be true.  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

Plaintiff has served as a police officer with the Metropolitan Police Department since July 2006.  See ECF No. 12 (Am. Compl.), ¶ 9.  Her struggles with MPD stretch back to that date and are extensive.  To begin, while at the police academy that year, Alberti alleges that fellow recruit Matthew Burke sexually harassed her through repeated propositions for sexual relations, leaving notes on her vehicle, and telling other recruits that he planned to "make Plaintiff his girlfriend."  Id., ¶¶ 35–39.  Plaintiff believed that this harassment was linked to rumors among recruits that she was a lesbian.  Id., ¶ 41.  While she reported Burke's conduct to Class Officer Gary Nelson and met with Sergeant Ashley Rosenthal, her concerns were purportedly dismissed, and she was told that she was "making a big deal out of nothing."  Id., ¶¶ 43–44.  Alberti claims that, rather than addressing the harassment, academy instructors deemed her a "problem child" and "initiated a campaign of disparate treatment and retaliation . . . that carries on until the present."  Id., ¶ 47.  To separate her from Burke, Plaintiff was placed in a different recruit class despite performing well, while Burke faced no disciplinary action.  Id., ¶¶ 50–54.

Alberti ultimately graduated from the academy in February 2007 and was stationed at the Sixth District.  Id., ¶ 70.  She alleges that she was "assigned to a dangerous or undesirable neighborhood on purpose . . . in an effort to intimidate and retaliate against her."  Id., ¶ 71.  Even with those efforts, she excelled and secured a position on the "elite Vice Narcotics Unit."  Id., ¶ 74.  Alberti nevertheless contends that she faced negative comments for having reported

sexual harassment.  In other words, "the hostile work environment from the academy did not

ever truly abate[] and followed her to [the Sixth District]."  Id., ¶ 79.  Her difficulties were

compounded by the fact that Officer Burke — the recruit who had allegedly harassed her at the

academy — was also assigned to the Sixth District.  Id., ¶ 76.  Officer Joseph Campbell, a

fellow member of that division, also "propositioned Plaintiff, attempted to flirt with Plaintiff,

and made clear he had a romantic/sexual interest in Plaintiff."  Id., ¶ 81.  Alberti maintains that

her time at the Sixth District and in the Vice Narcotics Unit made her "both a victim and

witness to multiple [Equal Employment Opportunity] violations."  Id., ¶ 80.

Plaintiff's involvement in a colleague's discrimination case marked another inflection

point in her MPD tenure.  In March 2011, Officer Joseph Tridico filed an EEO complaint

alleging religious discrimination.  Id., ¶ 83.  Three years later, Alberti testified on Tridico's

behalf at trial, stating that Officer Lee Shefman had bullied and discriminated against Tridico.

Id., ¶ 89.  Shortly thereafter, she was removed from the Vice Narcotics Unit and "involuntarily

transferred to [the] Second District" despite the absence of any performance issues.  Id., ¶¶ 90–

91.  Alberti claims that once her participation in Tridico's trial became known, "she was

repeatedly retaliated against and targeted for frivolous disciplinary write-ups by the Sergeants in

her unit."  Id., ¶ 92.

Eight years passed.  In February 2022, Shefman — now promoted to sergeant — was

transferred to the Second District, where Plaintiff was still assigned.  Id., ¶ 93.  Alberti asserts

that immediately after Shefman arrived, "he began to retaliate against Plaintiff[] and to poison

Plaintiff's colleagues against her."  Id., ¶ 94.  For example, Shefman wrote up Plaintiff for

refusing to make herself available for a call even though she explained that the issue stemmed

from a technical problem with her vehicle's computer.  Id., ¶ 95.  Alberti further claims that she
overheard Shefman telling other officers that she "has always been a problem."  Id., ¶ 96.

On September 20, 2022, Plaintiff sought a meeting with Commander Duncan Bedlion —
the unit leader for the Second District — to request a transfer to a different district given the
"targeted retaliation and harassment from other officers who were aware of her history."  Id.,
¶¶ 99–100.  The next day, Sergeant Nicholas Kunez wrote her up for a uniform violation.  Id.,
¶ 101.  Although Alberti had a medical note allowing her to modify her uniform, she still
received a citation for not having her documentation when Kunez confronted her.  Id., ¶¶ 101–
02.  Plaintiff alleges that male officers were often given medical waivers for shaving and were
never reprimanded if they failed to have a medical note on hand.  Id., ¶ 103.  In her case, she
was suspended until she won her appeal of the charge.  Id., ¶¶ 104–05.

"At some time," Officer Campbell — who had allegedly harassed Plaintiff at the Sixth
District — transferred to the Second District.  Id., ¶ 108.  According to Plaintiff, Campbell
"picked up where he left off" by making repeated unwanted advances, attempting to engage her
in conversations about his sex life, trying to show her sexual videos, and inviting her to sex
clubs.  Id., ¶¶ 108–10.  When Alberti rejected his advances, Campbell allegedly began making
derogatory comments about her sexual orientation, saying, "[Y]ou must be gay."  Id., ¶ 112.
Plaintiff complained to her immediate supervisor, Sergeant Phillip Robinson, about Campbell's
behavior on at least five occasions in 2022 to no avail.  Id., ¶¶ 114, 116.

Alberti elevated her concerns by meeting directly with Chief of Police Pamela Smith in
early 2023.  Id., ¶ 119.  She raised several issues in that meeting, including the sexual
harassment she had experienced and the fact that Shefman had been "promoted and placed in
authority over Plaintiff" despite her testifying against him.  Id., ¶¶ 119–21.  Chief Smith

purportedly took no action to address her concerns and instead referred her to the Department's EEO office.  Id., ¶¶ 123–25.

On July 20, 2023, Plaintiff filed a formal complaint with MPD's EEO office alleging that Campbell was sexually harassing her and that Sergeant Robinson had refused to take appropriate action.  Id., ¶ 126.  Shortly after filing, Alberti claims that her colleagues began discussing the complaint and that she "noticed an immediate increase in the hostility towards her by her supervisors, most especially Sgt. Robinson."  Id., ¶¶ 128–29.  The complaint was investigated and sustained on November 28, 2023.  Id., ¶ 131.

Less than a month later, on December 21, Plaintiff filed charges with the Equal Employment Opportunity Commission asserting claims for discrimination based on race, sex, sexual orientation, and retaliation.  Id., ¶ 6; see also ECF No. 14-1 (EEOC Charge).  Alberti stated that she faced sex discrimination and that she had been "harassed, bullied, treated desperately [sic], and repeatedly subjected to a hostile work environment" based on the perception of her sexual orientation.  See EEOC Charge at ECF p. 1.  Plaintiff explained that her EEO complaints resulted in her being "severely retaliated against by being refused desirable assignments[] and by being abandoned while executing [her] duties in a potentially dangerous situation."  Id.  Alberti further claims that Sergeant Shefman had continuously targeted her, including by "co-opting his colleagues to retaliate against [her] by fabricating reasons to discipline [her]" and "slandering [her] and attacking [her] character to [her] colleagues, which [created] a continuing and escalating hostile work environment."  Id. at ECF p. 2.  She ultimately received a right-to-sue letter from the EEOC on August 20, 2024.  See Am. Compl., ¶ 7.

Alberti alleges that the fallout from her reporting was swift and sustained, taking several forms. First, she claims that she was "retaliated against by being disciplined for failing to 'follow departmental guidelines.'" Id., ¶ 132. For instance, in January 2024, Sergeant Robinson issued her a counseling letter for allegedly not reporting for service in a timely fashion — an infraction Plaintiff contends was common and rarely enforced. Id., ¶¶ 133, 135. After a union shop steward intervened, Robinson wrote up two male officers for the same offense. Id., ¶¶ 135–37. On April 11, 2024, Alberti received two more counseling letters: one from Sergeant Benton for using a station computer to file a report and another from Sergeant Shefman claiming Plaintiff had refused to report to service with her partner. Id., ¶¶ 148, 153. The latter, Alberti asserts, was "not only retaliation for her complaint, but also related to Plaintiff's testimony against Sgt. [Shefman] in the Tridico case" from 2014. Id., ¶ 154. Alberti maintains that throughout 2024, she was "subjected to multiple counseling letters and reprimands, which were issued as part of a scheme to retaliate against her for her protected activity." Id., ¶ 157.

Second, Plaintiff alleges that she was given unfavorable assignments and denied the benefits of her seniority. On several occasions in 2023 and 2024, Alberti states that she was "unfairly singled out" for dangerous duties such as transporting "combative psycho[tic] prisoners" — an assignment typically distributed evenly — "as a form of retaliation." Id., ¶¶ 140–41. She further contends that she was routinely assigned menial tasks or work reserved for less senior officers as part of her supervisors' efforts "to demonstrate their displeasure with her for complaining about her fellow officers." Id., ¶¶ 142–43.

Third, Alberti alleges that she was isolated and denied information necessary to do her job safely. The purported smear campaign against her made colleagues wary of working with

her because she was "so frequently targeted for scrutiny and discipline" and "they feared becoming collateral damage." Id., ¶ 161.  Plaintiff claims that she was often left as the only officer responsible for patrolling busy areas, which increased her workload and compromised her safety. Id., ¶ 144.  In one instance, she was sent to a crisis-intervention assignment without shift members' sharing that the patient on the scene was homicidal and suicidal. Id., ¶ 172.

Last, Plaintiff alleges that she has been "subject to a continuing and ongoing hostile work environment that . . . [has] stymied her job development and promotion opportunities." Id., ¶ 162.  Alberti highlights that she has been repeatedly overlooked for various positions — Property Clerk, Field Training Officer, Station Clerk, School Resource Officer — over the years and that this pattern resurfaced following her July 2023 EEO complaint. Id., ¶¶ 163–64.  After scoring well on the sergeant-promotion exam in September in 2023, she was excluded from a batch of promotions in December 2023 and February 2024. Id., ¶¶ 165–66.  When Plaintiff was next on the list for promotion to sergeant in April 2024, MPD allegedly circumvented her promotion by mixing names on the current list with names from a list that had expired in August 2023. Id., ¶ 168.

### B. Procedural Background

Alberti filed the present action against the District of Columbia on November 14, 2024. See ECF No. 1 (Compl.).  After Defendant moved to dismiss, see ECF No. 9 (First MTD), Plaintiff filed an Amended Complaint to "expand[] upon and add[] further factual detail to her claims." ECF No. 11 (Mot. to Amend Compl.) at 4.  As just detailed, the result is a sprawling Complaint that vacillates between claims that Plaintiff was attacked for reporting misconduct and claims that she was treated differently either because she is a woman or because she is perceived to be a member of the LGBTQ community.  At bottom, Alberti contends that she has

been "the subject of systematic harassment, bullying, denigration, intimidation and retaliation for having complained about sexual harassment." Am. Compl. at 1.

Her fourteen counts allege the following: gender-based hostile work environment under Title VII and the D.C. Human Rights Act (DCHRA) (Counts I & II), retaliatory hostile work environment under Title VII and the DCHRA (Counts III & IV), gender-based disparate treatment under Title VII and the DCHRA (Counts V & VI), retaliatory disparate treatment under Title VII and the DCHRA (Counts VII & VIII), retaliatory hostile work environment and disparate treatment under the D.C. Whistleblower Protection Act (DCWPA) (Counts IX & X), sexual-orientation disparate treatment and hostile work environment under the DCHRA (Counts XI & XII), and sexual-orientation retaliatory hostile work environment and disparate treatment under the DCHRA (Counts XIII & XIV). Id., ¶¶ 180–311. She seeks compensatory damages as well as declaratory and injunctive relief. Id., ¶¶ 316–19. The District has again moved to dismiss, contending that Plaintiff's claims are time barred, that she failed to exhaust her administrative remedies, that she has not plausibly alleged the elements of her various causes of action, and that certain counts are duplicative. See ECF No. 14 (Second MTD) at 4.

The Court was prepared to resolve the present Motion when it noticed a troubling problem: Plaintiff's Opposition was riddled with citations to cases that do not exist and references to paragraphs in the Complaint that did not support the propositions for which they were cited. See ECF Nos. 19 (First Reply) at 11 n.3 (summarizing errors); 18 (First Opp.). The Court held a hearing on October 16, 2025, to provide Plaintiff's counsel an opportunity to respond to Defendant's allegations of inaccurate and invented quotations and citations. See Minute Entry of Oct. 16, 2025. At that hearing, Plaintiff's counsel offered what has become a far-too-familiar refrain: artificial intelligence was used to draft the brief, and no one at the firm

verified the accuracy of its contents before filing it with this Court.  The result of that error was added confusion in an already expansive case and unnecessary work for both the Court and Defendant.  The Court, nevertheless, permitted Plaintiff to file an Amended Opposition, see ECF No. 24-1 (Am. Opp.), and Defendant to file an Amended Reply.  See ECF No. 27 (Second Reply).  Counsel's conduct is the subject of a separate motion for attorney fees.  See ECF No. 29 (Am. Fee Mot.).

## II.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating a Rule 12(b)(6) motion, the court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted).  The pleading rules are "not meant to impose a great burden," Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and "detailed factual allegations" are thus not necessary.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  The court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  The facts instead "must be enough to raise a right to relief above the speculative level" even if "recovery is very remote and unlikely."  Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### III.    Analysis

The Court addresses Defendant's arguments in four parts.  First, it considers which claims are barred by the applicable statutes of limitations.  Second, it evaluates Plaintiff's retaliatory-hostile-work-environment counts to determine whether she plausibly alleges harassment sufficiently severe or pervasive to state a claim and whether she has fully exhausted such claims.  Third, it turns to Alberti's discrete retaliation claims to assess whether she adequately pleads causation between protected activity and purportedly adverse actions.  Finally, it addresses Defendant's position that certain counts are duplicative.

### A.    Time-Barred Claims

Both Title VII and the DCHRA impose statutory filing obligations that employees must follow.  Newell v. Mnuchin, 2020 WL 136648, at *22 (D.D.C. Jan. 13, 2020) ("[F]ederal regulations establish strict timing requirements that apply to Title VII claims."); Barrett v. Covington & Burling LLP, 979 A.2d 1239, 1245 n.2 (D.C. 2009) (explaining DCHRA timing requirements).  Under Title VII, an employee must "file [an EEOC] charge within 300 days of the alleged discriminatory acts."  Richardson v. Nat'l R.R. Passenger Corp., 2025 WL 1568198, at *4 (D.D.C. June 3, 2025); see also 42 U.S.C. § 2000e-5(e)(1) (charge must be filed "three hundred days after the alleged unlawful employment practice occurred").  "A DCHRA claim must be filed with the D.C. Office of Human Rights or any court of competent jurisdiction within one year of the alleged conduct."  Clay v. Howard Univ., 82 F. Supp. 3d 426, 433 (D.D.C. 2015) (citing D.C. Code §§ 2-1403.04(a), 2-1403.16(a)).  If an employee timely files a complaint with the D.C. Office of Human Rights (DCOHR) first, it "toll[s] the time to file a private cause of action until after the Office has served a notice of right to file a civil action."  D.C. Code § 2-1403.16(b)(2).

Here, Plaintiff filed her EEOC charge on December 21, 2023, <u>see</u> EEOC Charge at ECF p. 1, meaning that any adverse actions that occurred before February 24, 2023, are not actionable under Title VII. As for the DCHRA, Alberti commenced the instant suit on November 14, 2024. The District asserts that acts occurring before November 14, 2023 — one year before suit was filed — are thus outside the bounds of the DCHRA limitations period. That calculation, however, ignores the statute's tolling provision. As just noted, Alberti filed a charge of discrimination with the EEOC on December 21, 2023. <u>See</u> Am. Compl., ¶ 6. In doing so, her charge was "automatically cross-filed with the [DCOHR] pursuant to a 'worksharing agreement' between the two agencies." <u>Ellis v. Georgetown Univ. Hosp.</u>, 631 F. Supp. 2d 71, 78 (D.D.C. 2009) (citing 29 C.F.R. § 1601.13(a)(4)(ii)(A)). The clock was therefore tolled until the EEOC issued her a right-to-sue letter on August 20, 2024. <u>See</u> Am. Compl., ¶ 7. Accounting for the approximately eight months of tolling, the correct cutoff for Plaintiff's DCHRA claims is mid-March 2023.

Regardless of whether the clock started ticking in February, March, or November 2023, timing presents an insurmountable barrier for several of Plaintiff's claims. Counts I and II allege a "Gender Based Hostile Work Environment/Ongoing Sexual Harassment" under Title VII and the DCHRA. <u>Id.</u>, ¶¶ 180–99. While Title VII does not define sexual harassment, courts have recognized it as a form of sex discrimination actionable as a hostile-work-environment claim. <u>See, e.g.</u>, <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986). The DCHRA, by contrast, defines sexual harassment to include conduct of a sexual nature that creates "an intimidating, hostile, or offensive work environment." D.C. Code § 2-1402.11(c-2)(2). Alberti claims that she "faced pervasive and continuous harassment based on her sex," including "derogatory and sexualized comments, excessive scrutiny, unjustified reprimands, and a pattern

of discrimination." Am. Compl., ¶¶ 184–85. As these allegations sound in hostile work environment, the Court analyzes Counts I and II together as gender-based hostile-environment claims.

Count XII, in turn, alleges a hostile environment based on sexual orientation under the DCHRA. Id., ¶¶ 289–99. Plaintiff claims that she "has faced pervasive and continuous harassment based on perceptions of her sexual orientation, creating a hostile work environment and severe emotional distress." Id., ¶ 291.

The critical question is whether Plaintiff has alleged any gender- or orientation-based hostile acts within the applicable limitations periods. She has not. Take the alleged conduct by then-recruit Burke, who repeatedly told Alberti that he was going to "make [her] his girlfriend" and that "[s]he will cave eventually." Id., ¶ 38. As unseemly as that conduct may be, it occurred nearly 20 years ago. Id., ¶ 35. Officer Campbell's sexual advances, attempts to show Plaintiff lewd videos, invitations to sex clubs, and accusations that Alberti "must be gay" are alleged to have occurred "at some time" when Campbell was transferred to the Second District. Id., ¶¶ 108–14. The closest Plaintiff gets to grounding her claim to a date is her assertion that "[o]n least five occasions in 2022, [she] complained to Sergeant Phillip Robinson . . . about Off. Campbell's behavior." Id., ¶ 114. Although the Amended Complaint chronicles Alberti's lengthy and troubled tenure at MPD in considerable detail, specific allegations of gender- or orientation-based hostile environment are absent after 2022 — well before the 2023 cutoff.

Plaintiff attempts to salvage these claims by pointing to a constellation of similar discriminatory actions that took place from 2023 to 2024. See Am. Opp. at 6. For instance, she highlights the repeated denial of her "medically justified hardship transfer," that men were given "[p]referential treatment . . . in assignments and discipline," and that she suffered various

adverse actions "following protected activity." Id.  None saves the day.  For one, Plaintiff never requested a medical transfer; she requested a transfer (in 2022) "because she continued to experience targeted retaliation and harassment from other officers who were aware of her history."  Am. Compl., ¶ 100.  More fundamentally, her allegations of preferential treatment and adverse actions — counseling letters, dangerous assignments, humiliation — are framed throughout the Amended Complaint as retaliation for her EEO activity, not as discrimination based on sex or sexual orientation.  Id., ¶¶ 132–57.  This conduct may support a retaliatory-hostile-work-environment claim, but it cannot breathe life into time-barred claims premised on different actors, different conduct, and a different theory of liability.

Perhaps recognizing her timing difficulties, Plaintiff invokes the continuing-violation doctrine to lend weight to her claims premised on gender and sexual orientation.  See Am. Opp. at 7.  "The continuing-violation doctrine provides that the statute of limitations may be tolled during periods of continuing . . . unlawful activity."  Kōloa Rum Co. v. Noem, 2026 WL 145882, at *11 (D.D.C. Jan. 20, 2026) (quotation marks omitted).  In the employment context, a hostile-environment claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (quotation marks omitted).  Such a claim is not time barred if "at least one act falls within the [limitations] period."  Id. at 122.

The continuing-violation doctrine, however, is "not . . . an open sesame to recovery for time-barred violations."  Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  As the Supreme Court has explained, so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Morgan, 536 U.S. at 117.  The inverse is equally true:

13

without at least one timely act of harassment based on the relevant protected characteristic, the continuing-violation doctrine cannot revive otherwise time-barred claims. Earlier acts may serve as "background evidence" to contextualize a timely claim, but they cannot substitute for one. Id. at 113.

The lack of a timely act negates Plaintiff's reliance on the continuing-violation doctrine. The Amended Complaint is bereft of any allegation of a gender- or orientation-based hostile environment taking place after 2022. As detailed above, the specific acts of harassment Plaintiff describes — Burke's conduct at the academy and Campbell's sexual advances and homophobic slurs — all occurred in 2006 at the earliest and 2022 at the latest. Any post-2022 conduct that Plaintiff identifies is, by much of her account, retaliation for reporting her colleagues, not harassment based on sex or sexual orientation. The continuing-violation doctrine permits a plaintiff to reach back in time to capture earlier acts of harassment, but only where there is a timely act to anchor the claim. Because there is none here, the doctrine provides no refuge.

Counts V, VI, and XI fare no better. These claims allege "Gender Based Disparate Treatment" under Title VII and the DCHRA, and "Sexual Orientation Disparate Treatment" under the DCHRA. Alberti claims that she "was sexually harassed by Off. Campbell and Sgt. Schefter," Am. Compl., ¶ 221, and that she "was repeatedly and consistently harassed by her coworkers because they perceived her to be a lesbian or bi-sexual." Id., ¶ 280. Even assuming that "Sgt. Schefter" is Sergeant Shefman — although this is unclear — the claims suffer from the same defect canvassed above: the Amended Complaint identifies no act of gender-based or orientation-based discrimination within the limitations period. Plaintiff merely states in a conclusory fashion that Campbell and "Schefter" sexually harassed her "during the statutory

period," id., ¶ 221, without any factual details to support that claim.  Such "threadbare and

conclusory statement[s] . . . [are] insufficient to survive a motion to dismiss."  Heagney v.

Bondi, 2025 WL 1496315, at *14 (D.D.C. May 22, 2025).

      Counts I, II, V, VI, XI, and XII will accordingly be dismissed as time barred under Title

VII and the DCHRA.

      B.  Retaliatory Hostile Work Environment

      Turning to what survives the timing threshold, the Court believes that Plaintiff's

retaliatory-hostile-work-environment claims stand on stronger ground.  Counts III and IV press

that theory under Title VII and the DCHRA, respectively.  See Am. Compl., ¶¶ 200–18.  Count

IX asserts the same theory under the DCWPA.  Id., ¶¶ 246–61.  Each count explains that Alberti

"engaged in protected activity" at various points in time, including by reporting sexual

harassment, discrimination, and hostile treatment in 2006, and by testifying against MPD

officers in the 2014 Tridico lawsuit.  Id., ¶¶ 204–07, 247–52.  The only timely instance of such

activity is her July 2023 EEO complaint describing sexual harassment and retaliation.  Id.,

¶¶ 208, 252–53.  Plaintiff asserts that her protected activity left her "labeled [as] a problem

child" and triggered "a campaign to harm and retaliate against Plaintiff that has been continuous

and ongoing."  Id., ¶¶ 205–06, 249–50.  In short, engaging in protected activity provoked "a

workplace where harassment and discriminatory conduct were tolerated, encouraged, and

protected."  Id., ¶ 213.

      "A hostile environment consists of several individual acts that may not be actionable on

their own but become actionable due to their cumulative effect."  Baird v. Gotbaum, 792 F.3d

166, 168 (D.C. Cir. 2015) (cleaned up).  To state a hostile-work-environment claim, a plaintiff

must allege that "his employer subjected him to 'discriminatory intimidation, ridicule, and

insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In assessing whether conduct meets this standard, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Durant v. D.C. Gov., 875 F.3d 685, 700 (D.C. Cir. 2017)). "This standard is a demanding one" because the law "is not intended to function as a 'general civility code' that regulates the 'ordinary tribulations of the workplace.'" Burrell v. Shepard, 321 F. Supp. 3d 1, 12 (D.D.C. 2018) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

A retaliatory-hostile-environment claim is "a special type of retaliation claim." Baird, 792 F.3d at 168. In a typical retaliation claim, the plaintiff must show that the employer took an adverse action — such as termination or denial of promotion — in response to protected activity. Baloch, 550 F.3d at 1196, 1198. Yet the D.C. Circuit has recognized that "a hostile work environment can amount to retaliation" — that is, the hostile environment itself can constitute the adverse action. Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006). To prevail, the plaintiff must still satisfy the standard of severity or pervasiveness that grounds a hostile-environment claim based on discrimination. Id.

The same standard applies under the DCHRA, which courts analyze in the same manner as such claims arising under Title VII. Singh v. Am. Ass'n of Retired Pers., Inc., 456 F. Supp. 3d 1, 5 n.1 (D.D.C. 2020) ("DCHRA claims are generally evaluated under the same legal framework as Title VII claims."); see also Lively v. Flexible Packaging Ass'n, 830 A.2d 874,

16

887 (D.C. 2003) (noting D.C. courts "have often looked to cases construing Title VII to aid [them] in construing the DCHRA") (cleaned up).  The DCWPA likewise prohibits retaliation against employees who disclose information about illegal activity or gross mismanagement, see D.C. Code § 1-615.52–53, and the D.C. Court of Appeals has held that "the retaliatory creation of a hostile work environment is a violation of the WPA."  McCall v. D.C. Hous. Auth., 126 A.3d 701, 706 (D.C. 2015).

Defendant does not dispute that, at a minimum, Alberti's July 2023 EEO complaint constitutes protected activity.  See Second MTD at 16; see also Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999) (filing EEO complaint is protected activity).  Plaintiff alleges that this activity triggered swift responses in the months between that July 2023 complaint and her December 2023 charge.  First, she experienced an "immediate increase in hostility towards her by her supervisors."  Am. Compl., ¶ 129.  Despite her exam score, Plaintiff was passed over for promotion to sergeant.  Id., ¶¶ 165–66.  Supervisors "unfairly singled [her] out" for dangerous duties such as transporting combative psychotic prisoners and left her as the sole officer responsible for patrolling busy areas — assignments that increased her workload and compromised her safety.  Id., ¶¶ 140–41, 144.  And, in one instance, Plaintiff was sent to a crisis-intervention scene without being informed that the patient was homicidal and suicidal — information vital to her safety.  Id., ¶¶ 171–73.

Plaintiff also points to conduct postdating the December 2023 EEOC charge.  For example, she highlights a pattern of allegedly frivolous counseling letters from multiple supervisors in 2024, id., ¶¶ 133, 148, 153, the manipulation of a promotion list to stymie her advancement, id., ¶¶ 167–69, and a denied transfer request in July 2024.  Id., ¶ 155.  This later conduct may properly be considered as part of the hostile environment under the continuing-

violation doctrine.  See Morgan, 536 U.S. at 117 ("Provided that an act contributing to the claim

occurs within the filing period, the entire time period of the hostile environment may be

considered by a court for the purposes of determining liability."); McCall, 126 A.3d at 707

(same); see also Singletary v. District of Columbia, 351 F.3d 519, 527–28 (D.C. Cir. 2003)

(treating post-EEOC-charge conduct as part of hostile-environment claim).  Here, the conduct

from July to December 2023 provides the timely anchor, and the conduct outside that window

reinforces the pervasiveness of the hostile environment.

        Her story becomes more plausible against an institutional backdrop of retaliation.

Alberti contends that her treatment reflects a broader institutional pattern at MPD.  Officers

targeted for reprisal are described as "being hot" — a term used "as a warning to steer clear of

that officer to avoid being collaterally damaged."  Am. Compl., ¶¶ 22–23.  When management

decides to push an officer out, they describe the coordinated effort as "baking a cake," with

different officials bringing different "ingredients" (i.e., disciplinary actions) to formulate "a

broad-based attack."  Id., ¶ 24.  According to Plaintiff, "MPD Chiefs of Police have been aware

of, and have directed their subordinates to execute campaigns that target an individual officer

for removal from MPD."  Id., ¶ 25.

        These allegations, taken together and viewed under the "totality of the circumstances,"

Baloch, 550 F.3d at 1201, describe more than run-of-the-mill supervisory criticism.  They

describe systematic isolation, dangerous assignments, promotion denials, and an institutional

culture of targeting complainants.  "While the parties' evidence may reveal that the alleged

misconduct does not rise to the level of severity or pervasiveness called for by the law[,] . . . the

conduct as stated is sufficiently offensive and frequent to survive a motion to dismiss."  Moore

v. Castro, 192 F. Supp. 3d 18, 47 (D.D.C. 2016), aff'd sub nom. Moore v. Carson, 775 F. App'x

2 (D.C. Cir. 2019).

      The District raises several arguments against the retaliatory-hostile-environment claims,

none of which is sufficient to warrant dismissal.  First, Defendant contends that Plaintiff failed

to exhaust her Title VII claims because her EEOC charge was too vague and because some

alleged conduct — particularly Shefman's 2024 retaliation — post-dates the December 2023

charge.  See Second MTD at 14–15.

      Exhaustion serves the important function of "giving the charged party notice of the

claim."  Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995).  Contrary to Defendant's

characterization, Plaintiff's charge was far from a "bald and imprecise" document that failed to

provide such notice.  See Second MTD at 14.  Alberti alleged that she "ha[s] been harassed,

bullied, treated desperately [sic], and repeatedly subject to a hostile work environment"; that she

"engaged in protected activity when [she] filed internal EEO complaints, and ha[s] been

severely retaliated against by being refused desirable assignments, and by being abandoned

while executing [her] duties in a potentially dangerous situation"; and that she "ha[s] been

denied promotion several times due to [her] protected activity."  EEOC Charge at ECF p. 1.

She checked both the "retaliation" and "continuing action" boxes on the EEOC form and named

at least one supervisor responsible for the retaliatory environment.  Id. at ECF pp. 1–2.  While

exhaustion is "an essential element" of a Title VII claim, Poole v. U.S. Gov't Publ'g Off., 258

F. Supp. 3d 193, 199 (D.D.C. 2017) (quotation marks omitted), "a complainant need not

describe every factual detail of her claim to satisfy the exhaustion requirement."  Craig v.

District of Columbia, 74 F. Supp. 3d 349, 365 (D.D.C. 2014).  The charge instead must

"provide the EEOC and defendants with sufficient notice to begin the investigative process."
Seed v. Pruitt, 246 F. Supp. 3d 251, 255 (D.D.C. 2017).  Plaintiff met that standard.

As to the post-charge conduct included in the Amended Complaint, Defendant's argument neglects that hostile-environment claims "are different in kind from discrete acts." Morgan, 536 U.S. at 115.  A hostile work environment "cannot be said to occur on any particular day" but "occurs over a series of days or perhaps years."  Id.  For such claims, post-charge conduct that continues the same unlawful pattern is part of the same "unlawful employment practice" alleged in the charge.  Id. at 117.  The 2024 conduct Plaintiff now alleges — counseling letters, continued isolation, promotion denials — is of a piece with the ongoing retaliatory campaign she described in her charge: retaliation through "refused desirable assignments," being "abandoned" in dangerous situations, being "denied promotion," and constant bullying enabled by supervisors.  See EEOC Charge at ECF p. 1.

Second, the District asserts that Plaintiff's allegations do not rise to the level of severity required for a hostile work environment and instead "constitute nothing more than 'the ordinary tribulations of the workplace.'"  Second MTD at 18–19 (quoting Burrell, 321 F. Supp. 3d at 12). To be sure, courts have held that disparaging remarks, negative performance evaluations, and heightened scrutiny by management do not, standing alone, create a hostile environment.  See Nurriddin v. Bolden, 674 F. Supp. 2d 64, 93–94 (D.D.C. 2009).  But, as discussed above, Plaintiff does not allege isolated acts of supervisory criticism.  She alleges a coordinated institutional campaign — complete with its own internal vocabulary — designed to force her out of MPD.  That campaign, she claims, resulted in professional isolation, compromised safety, stalled career advancement, and a workplace where speaking up made her a target.

Last, Defendant argues that Plaintiff's DCWPA claim should be dismissed because she "cannot establish a causal link between any alleged protected disclosure and alleged retaliation," as the earliest alleged adverse action occurred more than five months after the protected activity. See Second MTD at 21–23. This argument misunderstands the causation analysis for hostile-environment claims. For discrete-act claims, temporal proximity between the protected activity and each specific adverse action is critical to establishing causation. See, e.g., Johnson v. District of Columbia, 935 A.2d 1113, 1120 (D.C. 2007) (concluding under DCWPA that four-month gap was insufficient to establish causation for discrete retaliation claim). But for retaliation premised on a hostile-environment claim, "the entire time period of the hostile environment may be considered by the court for the purposes of determining liability," Morgan, 536 U.S. at 117, and causation is assessed by looking at whether the hostile environment as a whole was triggered by the protected activity. McCall, 126 A.3d at 706–07 (applying this framework to DCWPA retaliatory-hostile-environment claim). Here, Alberti alleges an "immediate increase in hostility" following her July 2023 complaint, see Am. Compl., ¶ 129 — a response that intensified in the months leading up to her December 2023 EEOC charge and continued thereafter. Viewing the allegations in their totality, Plaintiff has plausibly alleged that her protected activity triggered the retaliatory campaign she describes.

Taken together, Plaintiff's allegations describe a plausible retaliatory-hostile-work-environment claim under Title VII, the DCHRA, and the DCWPA. Whether evidence will bear out these allegations is a question for another day. The Motion will therefore be denied as to Counts III, IV, and IX.

C.  Retaliatory Disparate Treatment

Plaintiff fails to achieve similar success with her claims of discrete retaliation.  Counts

VII and VIII allege retaliatory disparate treatment under Title VII and the DCHRA,

respectively.  Id., ¶¶ 229–45.  Count X asserts the same theory under the DCWPA.  Id., ¶¶ 262–

77.  Unlike the retaliatory-hostile-environment claims addressed above — which allege that the

cumulative effect of Defendant's conduct created an abusive work environment — these counts

must rest on specific adverse actions that were taken in response to Alberti's protected activity.

Taylor v. Mills, 892 F. Supp. 2d 124, 137 (D.D.C. 2012) ("A hostile work environment claim is

different in kind from a claim involving discrete acts of retaliation because a hostile work

environment is an ongoing, ambient form of discrimination that is categorically distinct from

discrete actions of discrimination, retaliatory or otherwise.") (cleaned up).  Alberti directs our

attention to a familiar set of actions in support of her claim: "[I]ssuing Plaintiff unwarranted

counseling letters"; "targeting Plaintiff for increased scrutiny and disciplinary actions";

assigning her "more difficult and demanding patrol duties" and "high-risk, high-stress

assignments without support"; and "denying Plaintiff opportunities for advancement within the

department, including denying multiple applications for promotions."  Id., ¶¶ 191, 235–36, 239.

A retaliation claim requires a plaintiff to plausibly allege that "(1) [she] engaged in

protected activity; (2) [she] was subjected to an adverse employment action; and (3) there was a

causal link between the protected activity and the adverse action."  Hairston v. Vance-Cooks,

773 F.3d 266, 275 (D.C. Cir. 2014); see also Ho v. Garland, 106 F.4th 47, 51 (D.C. Cir. 2024)

(same).  A "materially adverse" action is one that would "dissuade[] a reasonable worker from

making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White,

548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  A

similar framework applies to claims under the DCHRA and DCWPA.  McFarland v. George Washington Univ., 935 A.2d 337, 355–56 (D.C. 2007) (DCHRA); Johnson, 935 A.2d at 1117–18 (DCWPA).

As explained above, there is no dispute that Plaintiff engaged in protected activity when she filed her July 2023 EEO complaint.  See Am. Compl., ¶ 126.  Alberti's claims, however, falter on the remaining elements.

Begin with the alleged adverse actions.  Several of the acts Plaintiff identifies do not, on their own, rise to the level of being materially adverse.  For instance, absent tangible job consequences, "a letter of counseling, a letter of reprimand, and an unsatisfactory performance review [are] not materially adverse actions" but instead constitute "job-related constructive criticism."  Wesley v. Georgetown Univ., 2018 WL 5777396, at *5 (D.D.C. Nov. 2, 2018) (quoting Baloch, 550 F.3d at 1199).  While Alberti contends that she was given a slew of undesirable assignments, "not every undesired change in work assignments or workload constitutes a materially adverse action in the retaliation context."  Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 56 (D.D.C. 2022).  Adjustments to work duties must instead involve "a significant change in employment status" that leads to "significantly different responsibilities" or causes a "significant change in benefits."  Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  She does not so allege here.

That leaves promotion denials.  "It is undisputed that the failure to promote an employee constitutes an adverse employment action."  Kelly v. LaHood, 840 F. Supp. 2d 293, 301 (D.D.C. 2012) (citing Stella v. Mineta, 284 F.3d 135, 146 (D.C. Cir. 2002)).  Alberti alleges that she was passed over for promotion to sergeant in December 2023 and skipped over once more

in February 2024.  See Am. Compl., ¶¶ 166–67.  She further alleges that, in April 2024, MPD

"circumvent[ed] her promotion" by "using an expired promotion list."  Id., ¶ 236.

While promotion denials clear the hurdle of material adversity, Plaintiff's claims fall

short on causation.  Causation in the retaliation context requires that a plaintiff "show that the

unlawful retaliation would not have occurred in the absence of the alleged wrongful action or

actions of the employer."  Richardson, 2025 WL 1568198, at *9 (cleaned up).  A plaintiff can

establish causation by providing "direct evidence of retaliatory intent."  Román v. Castro, 149

F. Supp. 3d 157, 169 (D.D.C. 2016).  She alternatively can make out a *prima facie* claim by

alleging "that the employer had knowledge of the employee's protected activity and that the

[retaliatory] personnel action took place shortly after that activity."  Cones v. Shalala, 199 F.3d

512, 521 (D.C. Cir. 2000) (quoting Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985)).

Critically, temporal proximity alone can support an inference of causation "only where the two

events are very close in time."  Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012).

Plaintiff has not provided direct evidence of retaliatory intent, nor has she alleged that

those responsible for promotion decisions knew of her July 2023 EEO complaint or her

December 2023 EEOC charge.  Furthermore, five months elapsed between Alberti's July 2023

EEO complaint and the first promotion denial in December 2023 — and longer still to the April

2024 manipulation of the promotion list.  See Am. Compl., ¶¶ 126, 166–69.  While courts in

this district have established that "there is no bright-line rule" for temporal proximity, "three

months is perceived as approaching the outer limit."  Greer v. Bd. of Trustees of Univ. of D.C.,

113 F. Supp. 3d 297, 311 (D.D.C. 2015).  The D.C. Court of Appeals has similarly found that "a

stretch of four months realistically cannot constitute temporal proximity in the ordinary sense of

that phrase." Johnson, 935 A.2d at 1120.  The five months separating the July EEO complaint

and the promotion denial falls outside the bounds.

Plaintiff argues that causation can nonetheless be established through a "pattern of

antagonism" that bridges the temporal gap.  See Am. Opp. at 13–14.  Under that theory, a

"plaintiff can establish a link between his or her protected behavior and [the alleged reprisal] if

the employer engaged in a pattern of antagonism in the intervening period."  Taylor v. Solis,

571 F.3d 1313, 1323 (D.C. Cir. 2009) (quoting Woodson v. Scott Paper Co., 109 F.3d 913,

920–21 (3d Cir. 1997)).  To rely on a pattern of antagonism, however, a plaintiff must offer

"evidence of a pattern of antagonism following closely on the heels of protected activity and

related to the challenged employment action."  Allen v. Johnson, 795 F.3d 34, 46 (D.C. Cir.

2015) (emphasis added).

The intervening conduct Plaintiff alleges — being singled out for dangerous duties, left

as the sole officer in busy areas, and sent to a crisis scene without vital safety information —

occurred in the relevant time frame between the July 2023 EEO complaint and the December

2023 promotion denial.  But the Amended Complaint does not connect this conduct to the

discrete action of promotion decisions.  Plaintiff never alleges who made the promotion

decisions in December 2023, February 2024, or April 2024, or that the supervisors responsible

for the antagonistic conduct — Sergeants Robinson, Benton, and Shefman — made or

influenced those decisions.  Cf. Richardson, 2025 WL 1568198, at *9 (finding causation where

supervisor who engaged in antagonistic conduct convinced decisionmaker to change position on

plaintiff's termination).  The pattern of antagonism shows that certain supervisors harbored

retaliatory animus, but it does not show that this animus infected the promotion process.  Cf.

Manuel v. Potter, 685 F. Supp. 2d 46, 69 (D.D.C. 2010) ("[C]ausation, or at least a reasonable

inference of causation[,] must be demonstrated even when [a pattern of antagonism] theory is advanced.").

In sum, Plaintiff has not stated a plausible discrete-retaliation claim. Most of the alleged conduct is not materially adverse, and the promotion denials that clear that hurdle lack a causal connection to her protected activity. The Motion will thus be granted as to Counts VII, VIII, and X.

### D. Duplicative Claims

Having now waded through twelve separate counts, the Court arrives at the final two. Count XIII alleges "sexual orientation retaliatory hostile work environment" under the DCHRA, and Count XIV alleges "sexual orientation retaliatory disparate treatment" under the same statute. See Am. Compl., ¶¶ 300–315. The District argues that these counts should be dismissed as duplicative. See Second MTD at 25. The Court agrees.

"Duplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 81 (D.D.C. 2010)); see also Bailey v. Fed. Bureau of Prisons, 780 F. Supp. 3d 96, 123–24 (D.D.C. 2025); Sandler v. Blinken, 2022 WL 4547557, at *7 (D.D.C. Sept. 29, 2022). Claims that are duplicative of others in the same suit should be dismissed "[a]s a matter of judicial economy." Wultz, 755 F. Supp. 2d at 81; see also U.S. EEOC v. Sec. Assurance Mgmt., Inc., 2025 WL 2911781, at *3 (D.D.C. Oct. 14, 2025) (same). Counts XIII and XIV meet that standard.

Count XIII (sexual-orientation retaliatory hostile work environment under the DCHRA) is the same claim as Count IV (retaliatory hostile work environment under the DCHRA) with a different label. Both counts rest on the same protected activity (the July 2023 EEO complaint),

the same retaliatory conduct (isolation, dangerous assignments, coordinated write-ups), and the same legal theory (that this conduct created a hostile environment in retaliation for Plaintiff's complaints).  The Amended Complaint makes the redundancy plain.  Paragraphs 303 through 312 of Count XIII are nearly identical to paragraphs 204 through 213 of Count IV.  Both sets of paragraphs describe the same prior protected activity (2006 harassment report, 2014 <u>Tridico</u> testimony), the same retaliatory actors (Robinson, Benton, Shefman), and the same retaliatory conduct (counseling letters, difficult assignments, promotion denials, hostile work environment).  The only difference is the sexual-orientation label, which does little to alter the analysis.  The root of both claims is a hostile work environment created by retaliation for reporting harassment.  Count XIII therefore adds nothing to Count IV and will be dismissed as duplicative.  <u>Cf.</u> <u>Foster v. Driscoll</u>, 2025 WL 1100028, at *4 (D.D.C. Apr. 14, 2025) (dismissing claims where "the very same list of conclusory allegations was copied and pasted" between counts).

The same is true of the parallel between Count XIV (sexual-orientation retaliatory disparate treatment under the DCHRA) and Count VIII (retaliatory disparate treatment under the DCHRA).  The Amended Complaint again reveals the overlap: paragraphs 307 through 311 of Count XIV are substantively identical to paragraphs 231 through 235 of Count VII.  Both describe the same protected activity, the same retaliatory actors, and the same retaliatory conduct.  Despite the added sexual-orientation label, the root of both claims is retaliation for reporting harassment.  Count XIV will thus be dismissed.

## IV.    Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion to Dismiss.  It will dismiss Counts I, II, V, VI, XI, and XII as time barred; Counts VII,

VIII, and X for failure to state a claim for discrete retaliation; and Counts XIII and XIV as duplicative.  It will deny the Motion as to Counts III, IV, and IX, which state plausible claims for retaliatory hostile work environment.  A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge


Date:  February 10, 2026